**STATE of North Dakota, Plaintiff and Appellee,**

v.

**John HUBER, Defendant and Appellant.**

**Cr. No. 1002.**

Supreme Court of North Dakota.

Jan. 23, 1985.

Owen Mehrer, State's Atty., Dickinson, for plaintiff and appellee.

Irvin B. Nodland of Lundberg, Conmy, Nodland, Lucas & Schulz, Bismarck, for defendant and appellant.

VANDE WALLE, Justice.

John J. Huber appealed from a jury verdict finding him guilty of four counts of murder and one count of attempted murder and from the judgment of conviction entered thereon. Huber was sentenced to life imprisonment on each count, the terms to be served consecutively. We affirm.

The parties stipulated:

"that on or about the 15th day of March, 1983, the Defendant, John J. Huber, fired shots from a ten-gauge shotgun owned by him into the bodies of Gladys Huber, Maurice O'Connell, Kathleen O'Connell and Dinah Riegel and as a result thereof all four of said persons died. In addition John Huber fired a shot from said gun at Timothy Riegel which did not hit Timothy Riegel because of evasive action taken by Riegel...."

Evidence at Huber's trial centered on his mental condition and emotional state at the time of the shootings. Huber has raised the following issues on appeal:

## I

Was it error for the trial court to refuse to give an instruction, to allow voir dire, or to allow cross-examination on the disposition of the defendant in the event the jury were to find him not guilty by reason of a lack of criminal responsibility?

## II

Did the court err in the wording of its manslaughter instruction?

## III

Did the trial court err in imposing a life sentence on the defendant upon a conviction of attempted murder?

## I

Huber requested that the jury be instructed as follows:

"Members of the jury you are advised that in the event you should find the defendant not guilty because of a lack of criminal responsibility the state's attorney is required by law to file a petition for involuntary treatment from which a hearing would be held for determination of the defendant's need for institutional custody, care or treatment."

Huber asserts that the trial court erred in refusing to instruct the jury on the consequence of a verdict of not guilty by reason of a lack of criminal responsibility. Noting that "[t]here is a split of authority among the states and jurisdictions as to whether such an instruction is required in the interest of a fair trial," Huber contends that "our state should adopt the rule that requires such an instruction be given when requested by the defendant."

Many decisions on this subject are collected and analyzed in Annot., 11 A.L.R.3d 737 (1967 and 1984 Supp.). Those decisions are generally summarized in 11 A.L.R.3d 737, 739:

"It is generally agreed in the cases reviewed herein that what happens to such a defendant is not a matter of 'punishment,' in the usually accepted meaning of the word, but many cases nevertheless take the position that the rule that the jury is not concerned with punishment is equally applicable to the procedure to be followed as respects an accused acquitted for insanity, and hold flatly that no instruction as to such procedure is proper. Others conclude that the giving of an instruction of the kind in question is

within the discretion of the trial judge. Taking a radically different view of the matter, the courts in the District of Columbia hold that such an instruction is not only proper, but necessary, and must be given in a case where the defense of insanity is raised, unless the defendant affirmatively objects to it." [Footnotes omitted.]

The leading case standing for the proposition that where the issue of insanity is raised an instruction on the consequences of a verdict of not guilty by reason of insanity should or must be given is *Lyles v. United States*, 103 D.C.App. 22, 254 F.2d 725, 728–729 (1957), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), which states the following rule:

"Sometimes a defendant may not want such an instruction given. If that appears affirmatively on the record we would not regard failure to give it as grounds for reversal. Otherwise, whenever hereafter the defense of insanity is fairly raised, the trial judge shall instruct the jury as to the legal meaning of a verdict of not guilty by reason of insanity in accordance with the view expressed in this opinion."

The opposing viewpoint is concisely stated in *State v. McLoughlin*, 133 Ariz. 458, 652 P.2d 531, 534–535 (1982):

"The disposition of a defendant upon the jury's verdict has nothing to do with the defendant's guilt or innocence and should never be considered by the jury in its deliberations."

A third line of cases leaves the matter in the trial court's discretion, as exemplified by *State v. Wade*, 96 Conn. 238, 113 A. 458, 460 (1921):

"Usually where this instruction is given it is with the purpose on the part of the judge that the jury may not find an insane person guilty, but [not] guilty on the ground of insanity. Whether such an instruction shall be given is for the trial judge to determine in the exercise of his sound discretion."

The court in *Dipert v. State*, 259 Ind. 260, 286 N.E.2d 405, 407 (1972), states that,

while a defendant is normally not entitled to such an instruction, a defendant

"through an appropriate channel, such as a curative instruction or statement by the judge, will be entitled to inform the jury of such procedures where an erroneous view of the law on this subject has been planted in their minds."

No "erroneous view of the law on this subject has been planted" in the minds of the jurors in this case, so a curative instruction was not necessary. No productive purpose would be served by analyzing each of the viewpoints stated at length. We have not been persuaded of the wisdom of adopting the rule sought by Huber. We believe the better rule is that an instruction on the consequences of a verdict of not guilty by reason of a lack of criminal responsibility ordinarily should not be given, except in a situation such as that in *Dipert, supra*.

■ The purpose of the jury is to find the facts and determine a defendant's guilt or innocence. The consequences of a verdict of not guilty by reason of a lack of criminal responsibility have no bearing on any issue which the jury must decide. An instruction of the kind requested would invite the jury to speculate about a defendant's ultimate disposition and invite it to render a verdict on the basis of something other than the evidence before it. See *State v. Garrett*, 391 S.W.2d 235 (Mo.1965). "Punishment, or whatever may transpire after the verdict, is not the concern of the jury." *State v. Park*, 159 Me. 328, 193 A.2d 1, 5 (1963). In short, "it is simply no business of the jury what happens to the accused if he is acquitted on the ground of insanity." Annot., 11 A.L.R.3d 737, 742 (1967). We therefore hold that the trial court did not err in refusing to instruct the jury on the disposition of the defendant in the event the jury were to find him not guilty by reason of a lack of criminal responsibility.

■ For the same reasons, we also find no error in the trial court's refusal to allow cross-examination of witnesses on this sub-

ject or to allow Huber to inquire into post-verdict disposition in voir dire.

## II

Huber next contends that the trial court erred in its instruction to the jury on the offense of manslaughter.[1] In particular, Huber argues that requiring a connection between the victim and the defendant, precipitating or aggravating the extreme emotional disturbance, injects an element not provided by the Legislature.

We note initially that Huber did not object to the instruction before it was given. While he interposed specific objections to other instructions, he did not do so with regard to the manslaughter instruction prior to its submission to the jury, other than to enter a blanket objection to not having his requested instructions given. The trial court thus was not apprised of any error in the instruction before submitting it to the jury.

After the jury retired for its deliberations, it requested that manslaughter be "explained to them better." Huber then asserted, for the first time, that the last

sentence of the instruction was erroneous. Counsel for the State responded that the instruction was proper under our decision in *State v. Trieb*, 315 N.W.2d 649 (N.D. 1982). The State has adhered to that argument on appeal. It has also appeared to argue that no manslaughter instruction should have been given and therefore "whatever instruction was given would only benefit the defendant and should not result in reversible error. See, e.g., *State v. Dilger*, 338 N.W.2d 87, 96 (N.D.1983)."

■ To the extent that the State argues that no manslaughter instruction should have been given, we disagree. The evidence clearly warranted a manslaughter instruction.

The State's reliance upon *State v. Trieb, supra,* is misplaced. All that we said in that case about a connection between a victim and a defendant is that:

"in every case we have read there has been some connection between the victim and the slayer precipitating or aggravating an emotional response in the defendant."

1. Huber requested that the following instruction be submitted to the jury:
   "A person is guilty of manslaughter, a class B felony, if he recklessly causes the death of another human being, or, if he causes the death of another human being under circumstances which would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse. The reasonableness of the excuse shall be determined from the viewpoint of a person in his situation under the circumstances as he believes them to be. An emotional disturbance is excusable, within the meaning of this subsection, if it is occasioned by any provocation, event, or situation for which the offender was not culpably responsible."
   The trial court instructed the jury as follows:
   "MANSLAUGHTER
   "A person is guilty of manslaughter if he:
   "1. Recklessly causes the death of another human being; or
   "2. Causes the death of another human being under circumstances which would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse. The reasonableness of the excuse shall be determined from the viewpoint of a person in

his situation under the circumstances as he believes them to be. An extreme emotional disturbance is excusable, within the meaning of this subsection only, if it is occasioned by substantial provocation, or a serious event, or situation for which the offender was not culpably responsible.
   "As it relates to recklessly causing the death of another human being under this instruction, voluntary intoxication alone is not sufficient to constitute recklessness under this instruction.
   "'Extreme emotional disturbance' as used in this instruction is defined as the emotional state of an individual who:
   "(a) Has no mental disease that rises to the level of insanity;
   "(b) Is exposed to an extremely unusual and overwhelming stress; and
   "(c) Has an extreme emotional reaction to it, as a result of which there is loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions.
   "In addition, as it relates to this instruction, there must be some connection between the victim and the Defendant precipitating or aggravating an extreme emotional disturbance in the Defendant."

*Trieb, supra,* 315 N.W.2d at 659. That statement does not constitute authority for the proposition that such a connection is required in order to convert what would otherwise be murder to manslaughter under § 12.1–16–02, N.D.C.C., which provides, in part:

"*12.1–16–02. Manslaughter.* A person is guilty of manslaughter, a class B felony, if he:

.        .        .        .        .

"2. Causes the death of another human being under circumstances which would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse...."

The quoted portion of our manslaughter statute was drawn from a proposed Federal Criminal Code provision which had been drawn from Model Penal Code (U.L.A.) § 210.3. The proposed Federal code formulation modified the Model Penal Code formulation "by deleting reference to 'mental' disturbance for which there is reasonable 'explanation.'" II *Working Papers of the National Commission on Reform of Federal Criminal Laws* 829 (1970). We also followed the Federal proposal by adopting the last sentence of § 12.1–16–02, N.D.C.C., providing that "[a]n emotional disturbance is excusable, within the meaning of this subsection, if it is occasioned by any provocation, event, or situation for which the offender was not culpably responsible."[2] Because our manslaughter statute is essentially derived from Model Penal Code § 210.3, we may look to the commentaries on that section for insight into the meaning and application of the statute. The Comment to Model Penal Code § 210.3, American Law Institute, *Model Penal Code and Commentaries* (Revised Commentaries, 1980) states, at pages 60–61:

"Section 210.3 of the Model Code continues a modified and substantially enlarged version of the rule of provocation. Subsection (1)(b) punishes as manslaughter 'homicide which would otherwise be murder [if it] is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse.' This formulation effects substantial changes in the traditional notion of provocation. For one thing, the Code does not require that the actor's emotional distress arise from some injury, affront, or other provocative act perpetrated upon him by the deceased. Under the Code, mitigation may be appropriate where the actor believes that the deceased is responsible for some injustice to another or even where he strikes out in a blinding rage and kills an innocent bystander. In some such cases, the cause and intensity of the actor's emotion may be less indicative of moral depravity than would be a homicidal response to a blow to one's person. By eliminating any reference to provocation in the ordinary sense of improper conduct by the deceased, the Model Code avoids arbitrary exclusion of some circumstances that may justify reducing murder to manslaughter.

"Section 210.3 also sweeps away the rigid rules that limited provocation to certain defined circumstances. Instead, it casts the issue in phrases that have no common-law antecedents and hence no accumulated doctrinal content. Where there is evidence of extreme mental or emotional disturbance, it is for the trier of fact to decide, in light of all the circumstances of the case, whether there exists a reasonable explanation or excuse for the actor's mental condition. This issue cannot be resolved successfully by categorization of conduct. It must be confronted directly on the facts of each case. By restating the ultimate inquiry, Subsection (1)(b) avoids the strictures of early precedents and puts the issue in the terms in which it should be considered. This development reflects the trend of many modern decisions to abandon preconceived notions of what consti-

---

**2.** Effective July 1, 1983, the sentence was amended to provide: "... by substantial provocation, or a serious event, or situation...." Section 12.1–16–02, N.D.C.C.

tutes adequate provocation and to submit that question to the jury's deliberation."

The instruction given, insofar as it requires "some connection between the victim and the Defendant precipitating or aggravating an extreme emotional disturbance in the Defendant," might very well constitute reversible error in a case involving a factual situation in which there clearly was no such connection. While we need not address that issue today, we do not wish to be understood as endorsing the submission of such an instruction in the future.

■ We disavow the instruction submitted to the jury, but we do not find that its submission constituted reversible error. In the instant case, the very evidence that justified the giving of a manslaughter instruction also satisfied the instruction's requirement of "some connection between the victim and the Defendant precipitating or aggravating an extreme emotional disturbance in the Defendant." There was evidence that Huber believed that his wife, Gladys, was having an affair with Maurice O'Connell, her boss at the bank where she worked. There was evidence that Huber believed it necessary that Kathleen O'Connell, Maurice O'Connell's wife, must be "terminated" because she knew of the affair. Huber also blamed the O'Connells for what he deemed to be an excessive number of hours that Gladys was working. There was evidence that Huber hated Timothy Riegel, Gladys Huber's brother; that Huber blamed Dinah Riegel, Timothy's wife, for John and Gladys Huber's impending divorce; and that he felt that Gladys's family, including the Riegels, had "closed ranks" against him.

Huber's argument that the jury was confused by the last sentence of the manslaughter instruction given is sheer conjecture. Huber further asserts, although he did not so assert at trial, that the "remaining portion of the manslaughter instruction was also erroneous after the court departed from the wording of the statute." Even if it was erroneous (and we do not decide that it was), Huber has not demonstrated any possibility of prejudice and we will therefore not consider it.

Huber argues in his brief:

"The court's method of attempting to deal with the jury question was to belatedly send in Defendant's Requested Jury Instruction No. 5. This was hardly corrective in nature as the first part of the instruction given by the court was virtually identical to Defendant's Requested Jury Instruction No. 5. Rather than help the jury to understand the confusing instruction sent in, the jury was given a repeat of the first portion of the original instruction. There was nothing wrong with that part of the instruction, however. It was the remainder of the instruction that constituted an erroneous statement of the law. This was not withdrawn or corrected."

No productive purpose would be served by discussing this matter at length. The record presented to us does not reveal that Huber asked that the instruction previously given be "withdrawn or corrected." Huber merely explained his position and said, "I think that the jury should have the requested instruction that I originally asked for." Huber cannot now be heard to complain because the trial court did as Huber suggested.

### III

■ Huber contends that the trial court erred in sentencing him to life imprisonment upon conviction for the attempted murder of Timothy Riegel. Huber contends that he should have been sentenced for attempted murder as a class A felony pursuant to § 12.1–06–01(3), N.D.C.C., as amended in 1983.

At the time of the shootings, murder was a class AA felony under § 12.1–16–01, N.D.C.C., with a maximum penalty of life imprisonment provided by § 12.1–32–01, N.D.C.C. At the time of the shootings, § 12.1–06–01(3), N.D.C.C., provided:

"3. Criminal attempt is an offense of the same class as the offense attempted, except that: a. an attempt to commit a

class A felony shall be a class B felony, and b. whenever it is established by a preponderance of the evidence at sentencing that the conduct constituting the attempt did not come dangerously close to commission of the crime, an attempt to commit a class B felony shall be a class C felony and an attempt to commit a class C felony shall be a class A misdemeanor."

Thus, at the time of the shootings, attempted murder was a class AA felony.

Section 12.1–06–01(3), N.D.C.C., was amended in 1983 (after the shootings occurred but before trial) to provide:

"3. Criminal attempt is an offense of the same class as the offense attempted, except that (a) an attempt to commit a class AA felony is a class A felony and an attempt to commit a class A felony is a class B felony; and (b) whenever it is established by a preponderance of the evidence at sentencing that the conduct constituting the attempt did not come dangerously close to commission of the crime, an attempt to commit a class B felony shall be a class C felony and an attempt to commit a class C felony shall be a class A misdemeanor."

Thus, attempted murder is now a class A felony. A class A felony is punishable by a maximum penalty of 20 years' imprisonment, a fine of $10,000, or both. Section 12.1–32–01(2), N.D.C.C.

Huber's first argument on this point is that the 1983 amendment reducing an attempt to commit a class AA felony to a class A felony "was necessitated by an oversight." It is not apparent to us that the failure to make attempted murder a class A felony when murder was reclassified from a class A to a class AA felony in a 1979 amendment of § 12.1–16–01, N.D.C.C., was an oversight. Other than the *ipse dixit* in his brief, Huber has provided us with nothing in support of this argument. Without more, the argument is without merit.

Huber's second argument on this point is based upon § 12.1–01–01(3), N.D.C.C., which provides:

"3. In cases pending on or after the effective date of this title, and involving offenses committed prior thereto:

.    .    .    .    .

"b. The court, with the consent of the defendant, may impose sentence under the provisions of this title which are applicable to the offense and the offender."

He argues that the amendment to § 12.1–06–01, N.D.C.C., reducing attempted murder from a class AA to a class A felony became effective July 1, 1983, and that, because this case was then pending and the alleged offense occurred prior thereto, he should have been sentenced pursuant to the 1983 amendment. This argument, however, overlooks the fact that Title 12.1, N.D.C.C., became effective on July 1, 1975, and § 12.1–01–01(3), N.D.C.C., applies to "cases ... involving offenses committed prior thereto." The trial court did not err in sentencing Huber to life imprisonment upon conviction for the March 15, 1983, attempted murder of Timothy Riegel.

For the reasons stated, the verdicts and judgment are affirmed.

ERICKSTAD, C.J., GIERKE, J., and PEDERSON, Surrogate Judge, concur.

PEDERSON, Surrogate Judge, participated.

Justice PAUL M. SAND, who died on December 8, 1984, was a member of this Court at the time this case was submitted.