2004 SD 82

**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Kenneth L. MARTIN, Defendant
and Appellant.**

No. 22631.

Supreme Court of South Dakota.

Argued March 23, 2004.

Decided June 23, 2004.

Larry Long, Attorney General, Jeffery J. Tronvold, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Michael Stonefield, Office of the Public Defender for Pennington County, Rapid City, South Dakota, Attorney for defendant and appellant.

SABERS, Justice.

[¶ 1.] On August 4, 2001, Kenneth Martin decided he was going to kill someone that night. He smoked some marijuana and built a silencer for his gun. At approximately 10:30 p.m., Martin walked across the street to the home of Robert Ludeman, a Rapid City police officer, and his fiancée LeAnn Barta. When Ludeman came to the door, Martin shot him twice in the chest and once in the abdomen. Ludeman also suffered blunt force trauma to his head and right hand. He died on his living room floor. Martin fled the scene when he saw Barta coming toward the front door from the living room.

[¶ 2.] The next day, believing that Barta had seen him, Martin called 911 and reported that he was the shooter. Martin was arrested and charged with alternative counts of first and second degree murder. He pleaded not guilty and not guilty by reason of insanity.

[¶ 3.] Psychiatrist Dr. Manlove testified at trial that Martin suffered from a delusional disorder at the time he shot Ludeman. According to Dr. Manlove, Martin believed that his faith in God gave him the power to raise people from the dead. He developed a theory that if he killed a person and let them experience hell and then raised them from the dead, the person would change their behavior and be "saved." Martin told Dr. Franks, the expert for the State, that he picked Ludeman at random. After shooting Ludeman, Martin did not attempt to raise him from the dead. Dr. Manlove testified that although Martin knew killing Ludeman was illegal, in the context of his delusion, Martin believed the killing was not wrongful. Dr. Franks testified that Martin suffered from a significant personality disorder, but that he knew the murder was wrongful and he was not insane. The jury convicted Martin of first degree murder.

[¶ 4.] On appeal, Martin raises several challenges to his conviction, all of which are centered around jury selection and jury instructions.

[¶ 5.] During jury voir dire, the State exercised thirteen consecutive peremptory strikes against females. Martin objected to the State's thirteenth and fourteenth strikes claiming that they violated his equal protection rights. The trial court accepted the State's justification for the challenged strikes and denied Martin's challenge.

[¶ 6.] Martin requested three jury instructions. The first two instructions distinguished the terms "wrongfulness" and "illegality" and would have informed the jury that it could find Martin legally insane if he proved in part that he "harbored a sincere belief that society would approve of his conduct if it shared his understanding of the circumstances underlying his actions." The third instruction would have

informed the jury that if Martin was found not guilty by reason of insanity, he would be committed to the human services center until he could prove to a court by clear and convincing evidence that his release "would not create a substantial risk of bodily injury to another person." Martin refers to this instruction as the "legal consequences" instruction. The trial court denied the instructions.

[¶ 7.] During closing arguments, Martin renewed his request for the legal consequences instruction, asserting that it was necessitated by the prosecutor's statements during jury voir dire and closing arguments. Martin argues that the State insinuated to the jury that by finding Martin not guilty by reason of insanity, the jury would be relieving him of any consequences for the killing. Among the prosecutor's statements were the assertions that, "any other verdict but guilty in the first degree, [Martin] won't be held accountable," and "to think about not holding this man accountable, that's reprehensible." The court sustained Martin's objections to these and other statements, but denied the instruction and Martin's motion for a mistrial.

[¶ 8.] The jury found Martin guilty of first degree murder, and Martin appeals raising four issues:

1. Whether the State's peremptory strikes violated Martin's right of equal protection.
2. Whether the trial court erred in denying Martin's proposed jury instruction on the legal consequences of a not guilty by reason of insanity verdict.
3. Whether the trial court erred in denying Martin's request for an instruction on the legal consequences of a not guilty by reason of insanity verdict and his mistrial motion in

light of the State's assertions in closing argument.
4. Whether the trial court erred in denying Martin's proposed jury instructions defining the term "wrongfulness."

[¶ 9.] **1. Whether the State's peremptory strikes violated Martin's right of equal protection.**

[¶ 10.] Martin objected to the State's peremptory strikes of jurors 13 and 14. At the time of Martin's objection, the State had exercised fourteen peremptory strikes, thirteen of which were against women. Martin argued that the State violated his right of equal protection by removing jurors from the panel based solely on gender.

[¶ 11.] In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89, 107 (1994), the United States Supreme Court held that gender discrimination in jury selection violates the Equal Protection Clause. When a defendant alleges gender discrimination in jury selection, he or she must make a prima-facie showing of intentional discrimination. *Honomichl v. Leapley*, 498 N.W.2d 636, 639 (S.D.1993) (citations omitted). If the defendant establishes a prima facie case, it creates a rebuttable presumption of purposeful discrimination. *Id.* The State can rebut the presumption by "articulating a clear and reasonably specific [gender] neutral explanation for using its peremptory challenge." *Id.* The explanation "need not rise to the level of a 'for cause' challenge; rather it merely must be based on a juror characteristic other than gender, and the proffered explanation must not be pretextual." *State v. Webster*, 2001 SD 141, ¶ 18, 637 N.W.2d 392, 397 (citing *JEB*, 511 U.S. at 145, 114 S.Ct. at 1430, 128 L.Ed.2d at 107 referring to *Batson v. Kentucky*, 476

U.S. 79, 97, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69, 88 (1986)).

[¶ 12.] The jury selection process began with a pre-trial juror questionnaire that addressed juror's opinions about issues relevant to the case. Based on those questionnaires, the parties struck many jurors for cause before they began voir dire. During voir dire, each party was permitted 22 peremptory challenges, all of which had to be exercised.[1]

[¶ 13.] Two juries were empanelled to try Martin. The first jury selected was in June, 2002, but due to a medical emergency, a mistrial was declared after the jury was sworn. In the first panel, the State exercised nineteen of its twenty-two peremptory challenges against women. Although there is nothing in the record to indicate a *Batson* challenge to the first jury selection, Defendant couples the first selection with the thirteen consecutive strikes against females in the second selection to make his prima facie case. The trial court found that under *Batson* and *J.E.B.* Martin made a prima facie showing of discrimination and the State does not appear to dispute this finding. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88 (1986); *J.E.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89. We accept the finding because it is not clearly erroneous.

[¶ 14.] The trial court required the State to justify the strikes, and the State responded:

I think the claim is unfounded. We have a reason for each and every juror that we have stricken, and always do. We have 22 [peremptory strikes] and we are at 14, and sometimes it's difficult to come up with 22, as defense well knows. [ ]

For the ones we have done so far, we have valid reasons. I'd go into [Juror # 14] first. She's 71 years old, divorced, and her response on the questionnaire to the insanity question was, some are insane at the time of the offense, which is neither here nor there, but I don't like it as well as I like the others.[2]

The State's reasons for a peremptory strike need not be "persuasive, or even plausible. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed [gender] neutral." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839 (1995) (additional citation omitted). In his brief, Martin concedes that there is at least one facially non-discriminatory reason for the strike of Juror 14; her answer to the questionnaire regarding insanity. We agree that this is a facially non-discriminatory justification. The trial court also agreed that the State had presented non-discriminatory justifications for the strike. That finding of fact is entitled to deference from this Court, and we will not overturn it absent a determination that the finding was clearly erroneous. Martin's concession, coupled with the deference given to the trial court's fact findings lead to the conclusion that the State proffered a non-discriminatory justification for its strike. Therefore, the burden shifted back to

---

1. SDCL 23A–20–3 provides:

When prospective jurors are called for examination, the court shall call to the jury box a number of prospective jurors equal to the number of jurors to be impaneled, the number of peremptory challenges allowed the parties, and number of alternates, if any.

2. On appeal, Martin argues only that the strike of Juror 14 violated his equal protection rights, therefore, we do not address the State's justification for striking Juror 13.

Martin to prove that the justifications were a pretext for gender discrimination. In attempting to meet that burden, Martin's counsel responded:

I don't think [her] responses on the questionnaire are considerably different than the responses of the 120 other people that were qualified to come in for jury service. The fact that she's 71 years old doesn't disqualify her. Many of the men are over 70. I don't think that their response or hers is non-gender discriminatory.

The trial court denied the challenge, holding:

The court recognizes the subjective nature that's necessary in the exercise of peremptory challenges and latitude that counsel are entitled to exercise in making their decisions for logical or illogical purposes. The only issue is whether or not they're done in a discriminatory manner. The court does not feel that the circumstances and the record support that there is a significant basis to believe that the state is exercising their peremptory challenges based on discriminatory purposes. The record may certainly reflect the history, both of the previous selection process and the current selection process, but I would not identify those last two jurors as being without a logical perception on the part of the state for their exercise. I'll deny the Batson challenge.

[¶ 15.] Martin argues that a comparison of the characteristics the State used to justify exclusion of Juror 14 with the characteristics of those remaining on the jury leads to the conclusion that the State's justification for striking Juror 14 was pretextual. First, she was 71 years old, and Martin points out that a 63 year old man and a 73 year old man sat on the jury. Second, she was divorced, and Martin points out that two male jurors listed their status as single and a third was divorced. Third, her answer to the juror questionnaire regarding the insanity defense was, "some are insane at the time of the offense." Males who sat as jurors answered the question similarly, stating, for example:

1) "under some circumstances—if the individual is found to be insane by a competent unbiased psychologist."

2) "yes, in some cases."

3) "yes a person can go insane; it is an appropriate law if not abused."

4) "I believe this is an appropriate law."

Martin argues that in order to determine whether the State's justifications are gender-neutral, it is necessary to compare the characteristics of those individuals placed on the jury with those rejected through peremptory strikes. *See e.g., United States v. Wilson,* 853 F.2d 606 (8th Cir. 1988). The State argues that while some male jurors had one of the characteristics listed by the State, none had all three. The State also points out that the cases upon which Martin relies for this argument had situations where "jurors shared one characteristic that was disparately treated due to race."

[¶ 16.] The Eighth Circuit Court has held that the determination whether an explanation is neutral "is a question of comparability. It is well-established that peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged." *Devose v. Norris,* 53 F.3d 201, 204 (8th Cir.1995) (additional citations omitted). We agree that comparative juror analysis is an important factor in determining whether peremptory challenges are discriminatory, however, it is not determinative, especially at the appellate level. Our standard of review on appeal is heightened, as it should be, given

that the trial court has the ability to measure the credibility of the attorney's justification for a strike. "A finding of intentional discrimination is a finding of fact entitled to appropriate deference by a reviewing court." *State v. Farmer*, 407 N.W.2d 821, 823 (S.D.1987) (additional citation omitted). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985) (citation omitted). We agree with the court in *People v. Dunn* that such comparative analysis by an appellate court does a disservice to the trial lawyers and courts because it can:

> undermine the trial court's credibility determinations and [ ] discount the variety of [subjective] factors and considerations, including prospective juror's body language or manner of answering questions, which legitimately inform a trial lawyer's decision to exercise peremptory challenges. [ ][C]omparative analysis to evaluate the bona fides of a prosecutor's stated reasons for peremptory challenges does not take into account the many considerations which go into an attorney's decision to select certain jurors while challenging others who appear to be similar. Trial lawyers recognize that it is a combination of factors rather than any single one which often leads to the exercise of a peremptory challenge. In addition, the particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view[.] [T]he same factors used in evaluating a juror may be given differ-

ent weight depending on the number of peremptory challenges the lawyer has at the time [ ] and the number of challenges remaining with the other side. Near the end of the voir dire process a lawyer will naturally be more cautious about "spending" his [ ] challenges. [ ] It should be apparent, therefore, that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar.

*People v. Dunn*, 40 Cal.App.4th 1039, 47 Cal.Rptr.2d 638, 645–46 (1995) (internal and additional citations and quotations omitted).

[¶ 17.] Although it is not determinative, it is interesting to note that the empanelled jury consisted of six females and six males.

■ [¶ 18.] The burden of proving that the State purposefully discriminated rests at all times on the defendant. *Honomichl*, 498 N.W.2d at 639 (citation omitted). Simply arguing that some of the jurors who were selected share one of the traits for which the juror was stricken is insufficient to carry Defendant's burden of proving that the trial court's finding was clearly erroneous. The trial court is affirmed on this issue.

[¶ 19.] **2. Whether the trial court erred in denying Martin's proposed jury instruction on the legal consequences of a not guilty verdict.**

■ [¶ 20.] Martin proposed a jury instruction for the purpose of informing the jury of the consequences of a not guilty by reason of insanity verdict. The instruction would have provided:

You are instructed that if you return a verdict of not guilty by reason of insanity, the law requires that the defendant be committed to the state human services center until such time as he is eligible for release pursuant to state statutes. The defendant would not be eligible for release from the human services center in the future until he has proven to the court by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person.

The trial court refused to give the proposed instruction based on *State v. Robinson*, 399 N.W.2d 324 (S.D.1987).

[¶ 21.] Our standard of review for refusal to give a jury instruction is well-settled:

We review a trial court's refusal of a proposed instruction under an abuse of discretion standard. The trial court has broad discretion in instructing the jury. Jury instructions are satisfactory when, considered as a whole, they properly state the applicable law and inform the jury. Error in declining to apply a proposed instruction is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice.

*Webster*, 2001 SD 141 at 7, 637 N.W.2d at 394 (internal citations omitted).

[¶ 22.] In *Robinson*, we were faced with the same question; whether a defendant pleading not guilty by reason of insanity was entitled to an instruction similar to the one proposed by Martin. We cited *State v. Huber*, a decision of the North Dakota Supreme Court, with approval:

The consequences of a verdict of not guilty by reason of a lack of criminal responsibility have no bearing on any issue which the jury must decide. An instruction of the kind requested would invite the jury to speculate about a defendant's ultimate disposition and invite it to render a verdict on the basis of something other than the evidence before it. Punishment, or whatever may transpire after the verdict, is not the concern of the jury. In short, it is simply no business of the jury what happens to the accused if he is acquitted on the ground of insanity. We therefore hold that the trial court did not err in refusing to instruct the jury on the disposition of the defendant in the event the jury were to find him not guilty by reason of a lack of criminal responsibility.

*Robinson*, 399 N.W.2d 324 at 326(citing *State v. Huber*, 361 N.W.2d 236 (N.D. 1985)).

[¶ 23.] Martin argues that the Court should overturn *Robinson* and permit defendants who plead not guilty by reason of insanity to have a jury instruction of the legal consequences of the plea. He asserts two justifications for overruling the case. First, he argues that jurors in an insanity defense case may be distracted from their fact finding function by the concern that the defendant will go free if found not guilty by reason of insanity. Second, he argues that the court has a compelling reason to allow such an instruction because commitment to the human services center is mandatory on a verdict of not guilty by reason of insanity.[3]

---

3. We need only briefly address his second argument. Martin simply argues that many states with mandatory commitment statutes either require or allow the instruction to be given. In *Robinson,* the Court was considering this instruction under the same statutory scheme currently in place. Therefore, this rationale has already been specifically disregarded by the Court and is insufficient to overrule *Robinson.*

[¶ 24.] The thrust of Martin's argument is that if a jury is not properly informed of the consequences of a not guilty by reason of insanity verdict, they will be inclined to ignore evidence of insanity and find the defendant guilty out of fear that otherwise, they will be letting a "psychopath [ ] roam at large." All but one of the cases cited by Martin for this argument pre-date our decision in *Robinson*. Given that the Court was aware of the status of the law at the time it released *Robinson*, these cases have no more persuasive force than they did at the time *Robinson* was written. Therefore, we will look primarily to the one case cited by Martin that post-dates our decision. In *State v. Shickles*, the Utah Supreme Court relied largely on a federal court decision, *Lyles v. United States*, 254 F.2d 725 (D.C.Cir.1957), to reason that a legal consequence instruction is necessary. *State v. Shickles*, 760 P.2d 291 (Utah 1988). We note first, that the federal court decision was in place, and presumptively rejected by this Court, at the time of our holding in *Robinson*. Furthermore, as the State points out, *Lyles* has since been rejected by the United States Supreme Court, which noted:

It is well established that when a jury has no sentencing function, it should be admonished to "reach its verdict without regard to what sentence might be imposed." The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing infor-

mation invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States*, 512 U.S. 573, 579, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (additional and internal citations omitted). The Court went on to state:

We are not convinced that jurors are as unfamiliar with the consequences of a [not guilty by reason of insanity (NGI)] verdict as [Defendant] suggests. It may have been the case in 1957 that, in contrast to verdicts of guilty and not guilty, a verdict of not guilty by reason of insanity ha[d] no ... commonly understood meaning. There is no reason to assume that jurors believe that defendants found NGI are immediately set free. *See Fisher*, 10 F.3d at 122 ("[H]ighly publicized cases, such as that involving John Hinckley, have dramatized the possibility of civil commitment following an NGI verdict.").

*Id.* (Additional citations omitted.) Martin has provided no authority which persuades us that *Robinson* should be overturned. The function of a criminal jury in South Dakota is to act as a fact finder to determine whether the defendant is guilty. We decline to interject considerations of sentencing into a jury's duties. Since the proposed instruction did not "properly state the applicable law," the trial court's refusal to give this instruction is affirmed.

[¶ 25.] **3. Whether the trial court erred in denying Martin's request for an instruction on legal consequences and his mistrial motion in light of the State's assertions in closing argument.**

[¶ 26.] Martin argues that the trial court should have either given an instruction on legal consequences or grant-

ed a mistrial based on remarks by the State's Attorney during voir dire and closing argument. During jury voir dire, the State's Attorney had the following exchange with a prospective juror:

> State: I suspect at the conclusion of this case you'll get a choice, and one being guilty and one being not guilty by reason of insanity, but there might be guilty but mentally ill. It's not yours to distinguish between that and what could happen after that, do you understand?
>
> Juror: Yes.
>
> State: Do you understand that not guilty is not guilty? So not guilty by reason of insanity is a not guilty verdict, do you understand that?
>
> Defense: I object to that. That's legally inaccurate.
>
> Court: Sustain the objection.
>
> State: Could we approach? (An unrecorded side bar discussion was had.)

[¶ 27.] In the rebuttal portion of his closing argument, the State's Attorney asserted:

> I apologize if I offend anybody by doing so, but this makes me upset. I submit to you that what we have here is a cold-blooded killer. Robbie Ludeman's life was tragically taken for no reason. That should anger us. And the fact of the matter is—the fact of the matter is, this man needs to be held accountable. And any other verdict but guilty in the first degree, he won't be held accountable.

At this point, the defense objected and the court sustained the objection and the statement was stricken from the record. The State continued:

> Folks, the fact of the matter is you need to hold this man accountable. What he

did was wrong. I heard Mr. Stonefield use a term in describing me as reprehensible. I heard him use a term in describing Mr. Sperlich as dishonest. That's grabbing at straws, folks. He later turns around and says his comments are arguments. What we're doing is arguing. Reprehensible? What happened in this case is reprehensible. And to think about not holding this man accountable, that's reprehensible.

The defense objected again, and the parties joined the trial court in chambers. The defense renewed its request for a jury instruction and when the trial court denied the request, the defense requested a mistrial. The trial court denied the motion for mistrial. Martin argues that the trial court should have permitted the instruction or in the alternative, granted a mistrial.

[¶ 28.] Our standard of review for refusal to give a jury instruction is abuse of discretion. *See Webster*, supra. We review a trial court's denial of a mistrial motion for abuse of discretion. *State v. Anderson*, 1996 SD 46, ¶ 21, 546 N.W.2d 395, 401.

> To justify the granting of a mistrial, an actual showing of prejudice must exist. Prejudicial error for purposes of determining whether error constitutes grounds for mistrial is error "which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it."

*State v. Anderson*, 2000 SD 45, ¶ 36, 608 N.W.2d 644, 655 (additional citations and quotations omitted).[4]

[¶ 29.] Martin argues that other courts have determined that when a prosecutor

---

4. Although noted in his issue statement, Martin does not appear to specifically argue in his brief that failure to grant a mistrial was abuse of the trial courts discretion.

misstates the law, a defendant may be entitled to a legal consequences instruction and that this Court should adopt a similar rule. Among the cases he cites in support of his argument is *Caldwell v. State.* In that case, the prosecutor argued in his rebuttal:

> Don't by your verdict and [sic] tell us that he's not responsible, don't tell us that he has a license to kill. *Don't let him walk out of this courtroom with the rest of us when this case is over with,* don't let him get away with murder. Don't let him get away with murder.

*Caldwell v. State,* 722 N.E.2d 814, 816 (Ind.2000) (emphasis supplied). The trial court overruled the defendant's objection to the comment and declined to allow a consequences instruction or an admonishment. On appeal, the court held, "a defendant is entitled to an instruction on the post-trial procedures if 'an erroneous view of the law on this subject has been planted in [the jurors'] minds.'" *Id.* (citing *Dipert v. State,* 259 Ind. 260, 286 N.E.2d 405, 407 (1972)). We note, however, that the court went on to say that a proper instruction would be "that the law provides for additional proceedings but that *this was not a matter for the jury to consider.*" *Id.* The same court reached the same conclusion in *Dipert v. State* when the prosecutor indicated to a jury member during voir dire that the defendant would go "scot-free" if found not guilty by reason of insanity. In *Dipert,* the trial court refused to give an instruction to the jury regarding the prosecutors comment despite objection by the defense. The court held "it is only because such a curative attempt was not made by the court that this conduct constitutes reversible error." *Dipert,* 286 N.E.2d at 407. Had the trial court instructed the jury that there were additional procedures after the finding of not guilty by reason of insanity, and *instructed the jury not to consider* those procedures

or penalties, there would have been no reversible error.

[¶ 30.] In the present case, the jury was instructed:

> It is your duty as a jury to determine the facts and you must do this from the evidence that has been produced here in open court. This consists of the testimony of the witnesses, the exhibits which have been received, facts stipulated to by the attorneys, and facts judicially noticed by the court. This evidence is governed by various rules of law and under these rules it has been my duty as judge to rule on the admissibility of the evidence from time to time. You must not concern yourselves with the reasons for these rulings and you must not consider any evidence or any testimony which has been ordered stricken. Such things you must put out of your mind.

The jury was further instructed:

> In arriving at a verdict in this case you shall not discuss or consider the subject of penalty or punishment, as that is the responsibility of the court.

[¶ 31.] The trial court properly instructed the jury that it was not to consider the penalties in reaching its sentence, and it sustained the Defendants objection to the comments and struck them from the record. The jury was properly instructed not to consider those things stricken from the record. Based on the curative measures taken by the court, and taking the record as a whole, we do not find that the jury had an erroneous impression of the law. We agree that when a prosecutor gives the jury an erroneous statement of the law, curative measures may be necessary to prevent reversible error. However, in the instant case, there is no indication that the trial court's measures were insufficient to cure any misunderstanding

engendered by the prosecutor's isolated statements.

[¶ 32.] The trial court did not abuse its discretion in denying the Defendant's motion for mistrial. The trial judge was present when the comments were made and had the opportunity to observe their impact. *State v. Kidd*, 286 N.W.2d 120, 122 (S.D.1979) (citation omitted). His determination that they did not "reach the level [ ] that would warrant either a mistrial or a special instruction" is affirmed.

[¶ 33.] **4. Whether the trial court erred in denying Martin's proposed jury instructions defining the term "wrongfulness."**

[¶ 34.] The statutory definition of "insanity" provides:

"Insanity," the condition of a person temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against him, he was incapable of knowing its wrongfulness, but not including an abnormality manifested only by repeated unlawful or antisocial behavior[.]

SDCL 22–1–2(20).

[¶ 35.] At trial, the Defendant presented testimony from Dr. Manlove indicating that Martin's knowledge of the "illegality" of the killing was not necessarily knowledge of the "wrongfulness" of the act. Dr. Manlove testified that one way for a person to be considered insane was if "in the course of a delusional process they did something that was right within the context of their delusion system but [ ] what would otherwise be considered wrong." He testified, "I came to the conclusion myself that [Martin] did not understand the wrongfulness of his acts because in the context of his delusional thinking, these acts were right acts." On further questioning, the doctor testified:

[Martin] indicated to me that he understood that it was a criminal act. He understood—I think he understood that it was a criminal act even as he did the act, even before the act. [But] he [ ] believed that he would be able to raise the person from the dead and even greater things would happen and it would be good for himself and the world and for Mr. Ludeman, that—that shooting him was the correct thing to do, was the right thing to do even though he understood that it was a criminal act.

Based on Dr. Manlove's testimony, the defense proposed two instructions which provided:

The term "wrongfulness" as used in these instructions, does not mean simply "illegality" or "criminality." A person knows that an act is wrongful not simply by knowing that it is illegal, but by knowing that it is morally disapproved of by society.

The defendant may establish that he was incapable of knowing the wrongfulness of the act charged if he can prove that, at the time of the act, he was temporarily or partially deprived of reason, and that he harbored a sincere belief that society would approve of his conduct if it shared his understanding of the circumstances underlying his actions.

[¶ 36.] The trial court refused to give the instructions, stating:

The court appreciates the concern of counsel and I would note that for the record, for whatever that's worth, that I have similar anxiety relating to the definition and presence of wrongfulness and the manner in which that is presented to the jury. But I don't believe it's within my capacity or my perception that to so define it as presented by counsel would be less confusing than the statute that we—than the instructions that we cur-

rently have. It is of some anxiety. I say that because the term merits consideration. But I believe that any effort to tamper with the pattern instructions may potentially create greater misunderstanding than enhancing the responsibility of the jury.

■■■ [¶ 37.] We review a trial court's refusal of a proposed instruction for abuse of discretion. *State v. Rhines,* 1996 SD 55, ¶ 111, 548 N.W.2d 415, 443.

> In order to be entitled to reversal of a conviction due to error in instructing the jury, an appellant must not only show error, but prejudicial error in the instruction. [ ] This requires a showing that the alleged error, in all probability, produced some effect upon the jury's verdict and was harmful to the substantial rights of the party assigning it.

*State v. Fast Horse,* 490 N.W.2d 496, 500 (S.D.1992) (internal and additional citations omitted).[5]

[¶ 38.] The jury was given the option of finding the Defendant guilty, not guilty, not guilty by reason of insanity or guilty but mentally ill of second degree murder or first degree murder. They found him guilty of first degree murder. The court provided the jury with several instructions on insanity and mental illness, but gave no instruction regarding the term "wrongfulness."

[¶ 39.] Jury instruction # 30 provided in part:

If you find that the Defendant has not proven by clear and convincing evidence that the Defendant was insane at the time of committing the offense, you must next consider whether the Defendant was mentally ill when the offense was committed.

The first step for the jury was therefore to determine whether the Defendant proved that he was insane at the time he committed the homicide. The jury was instructed:

> Insanity means the condition of a person temporarily or partially deprived of reason, upon proof that at the time of committing the act charged, *the defendant was incapable of knowing its wrongfulness.* Insanity does not include any abnormality manifested only by repeated unlawful or antisocial behavior.

(Emphasis supplied.) If the jury determined that the Defendant failed to prove insanity by clear and convincing evidence, its second step was to consider whether Martin was mentally ill at the time the offense was committed. The jury was instructed:

> Mental illness means substantial psychiatric disorder of thought, mood or behavior which affects a person at the time of the commission of the offense and which impairs a person's judgment, *but not to the extent that the person is incapable of knowing the wrongfulness of the act.* Mental illness does not include abnormalities manifested only by re-

---

**5.** The burden of proving prejudice in cases where the trial court has refused to give a jury instruction has been differently stated in several cases. One line of cases indicates that failure to give a proposed instruction that properly states the law is prejudicial error. *See e.g., Leisinger v. Jacobson,* 2002 SD 108, ¶ 8, 651 N.W.2d 693, 696; *Boomsma v. Dakota, Minnesota & Eastern R.R. Corp.,* 2002 SD 106, ¶ 30, 651 N.W.2d 238, 245; *Parker v. Casa Del Rey–Rapid City, Inc.,* 2002 SD 29,

¶ 5, 641 N.W.2d 112, 115. Another line of cases indicates that even if the proposed instruction correctly states the law, the appellant bears the burden of proving that failure to give the instruction was prejudicial. *See e.g. State v. Engesser,* 2003 SD 47, ¶ 43, 661 N.W.2d 739, 753; *Webster,* 2001 SD 141 at 7, 637 N.W.2d at 394; *State v. Knoche,* 515 N.W.2d 834, 838 (S.D.1994). The latter instruction is the prevailing view in criminal cases.

peated criminal or otherwise antisocial conduct.

(Emphasis supplied.)

[¶ 40.] Martin argues that the court's failure to instruct on the term "wrongfulness" prevented the jury from finding him not guilty by reason of insanity. In order to prevail, Martin must offer proof that "the alleged error, in all probability, produced some effect upon the jurys verdict and was harmful to the [defendant's] substantial rights." *Fast Horse*, 490 N.W.2d at 500. Martin fails to meet this burden. If the jury believed that he had a legally cognizable mental defect or illness, but that he knew his act was wrongful, they were bound to find him guilty but mentally ill. In other words, any prejudice caused by failure to instruct on "wrongfulness" would result in a guilty but mentally ill verdict because the primary difference between guilty but mentally ill and not guilty by reason of insanity is whether the defendant was incapable of knowing the wrongfulness of his act. By finding him guilty of first degree murder, the jury rejected his assertion that he was suffering under any legally cognizable mental defect at the time of the crime, regardless of his knowledge of the wrongfulness of the killing. The Defendant therefore fails to show prejudice in the court's refusal to give the instruction.

[¶ 41.] It is plausible that the jury rejected the claim that under any definition, Martin knew his actions that evening were "wrongful." There was testimony directly contrasting Martin's claim that he believed killing Ludeman would be morally right. The State's expert, Dr. Franks, testified as to his conversation with Martin:

Now, what Mr. Martin explained to me was that [ ] up until that day talked he himself out of that saying "this is ridiculous. I can't do this. This isn't true." And even on the day of the event told himself or told me that he knew it was wrong. I asked him that specifically. He said "yes, it was wrong and I know others would feel it was wrong. But I had to do it. I struggled a lot with it. It was hard to do. The dude was handy." Again these words are his. "He just happened to be the one I picked. I had to break every rule I knew. And I knew most people would view it as wrong. [ ] It was scary. I didn't want to do it. It went against everything, all the rules."

The doctor went on to state, "I truly felt after this discussion with him that—talking about his thoughts that he did understand what he was about to do was wrong." He noted several corroborating factors he relied upon in coming to the conclusion; that Martin acted at night, he used a silencer, he ran when Ludeman's fiancée came toward him, he hid the gun, hid his shirt, and prior to turning himself in, asked his sister to hide his marijuana bowl because he didn't want to further incriminate himself. Dr. Franks concluded, "[n]ow, perhaps an example of someone who truly was delusional would have been someone who would have stayed there trying to raise Mr. Ludeman from the dead if he truly believed that. I mean, that was the pinnacle of what he was trying to accomplish. [ ] But he didn't. He left and tried to hide his tracks." In other words, the jury could properly determine Defendant knew the difference between right and wrong at the time of the killing.

[¶ 42.] In summary, the jury instructions accurately set forth the law with regard to an insanity defense. The pattern jury instructions provided the jury with a proper statement of the law regarding the insanity defense. Nothing contained therein prevented the jury from accepting Dr. Manlove's expert opinion of insanity based upon Defendants alleged

belief that the killing was not morally wrongful. The Defendant has failed to establish that the trial court abused its discretion in refusing to give the proposed instructions. Affirmed.

[¶ 43.] GILBERTSON, Chief Justice, and MEIERHENRY, Justice, concur.

[¶ 44.] KONENKAMP and ZINTER, Justices, concur in part and concur in result in part.

ZINTER, Justice (concurring and concurring in result).

[¶ 45.] I concur on Issues 1,[6] 2, and 3. I concur in result on Issue 4.

Issue 4—Insanity Defense Instructions

[¶ 46.] I must concur in result on Issue 4 because I disagree with two points in the Court's analysis. In ¶ 41, the Court justifies the failure to give Martin's proposed definitional instruction on a "morally right" theory of insanity. This Court justifies the refusal because there was evidence from the State's expert, Dr. Franks, "contrasting Martin's claim that he believed killing Ludeman would be morally right." *Id.* Relying upon this opposing evidence, the Court concludes that it was "plausible that the jury rejected [Martin's] claim that under any definition, Martin knew his actions that evening were 'wrongful.'" Further relying on the State's evidence from Dr. Franks, this Court ultimately concludes that "the jury could properly determine defendant knew the difference between right and wrong at the time of the killing." *Id.*

[¶ 47.] Although the Court is correct that in this case the State's expert did offer evidence contrasting Martin's legal theory of mental illness, courts may not decline to give *defense* instructions simply because *the State* has introduced "testimony directly contrasting [the defendant's] claim[.]" *See id.* On the contrary, the well established rule for giving jury instructions does not look to the evidence *opposing* the evidence offered by the proponent of the instruction. Rather, the trial court should determine whether the *proponent* of the instruction has offered competent evidence to support the instruction. Our rule is clear that: "Criminal defendants are entitled to instructions on their theory of the case when evidence exists to support that theory." *State v. Bruder,* 2004 SD 12, ¶ 8, 676 N.W.2d 112, 115 (citing *State v. Charles,* 2001 SD 67, ¶ 19, 628 N.W.2d 734, 738 (citing *State v. Charger,* 2000 SD 70, ¶ 40, 611 N.W.2d 221, 229)). "Denial of a defendant's request for an instruction [ ] where such a request is properly submitted and supported by the evidence is reversible error because it infringes on a defendant's constitutional right to due process." *Id.* (citations omitted).

[¶ 48.] Therefore, I cannot join the Court's extensive reliance upon *the State's* expert's testimony, *see supra* ¶ 41, as the basis to deny giving a *defendant's* proposed instruction. Instead, the correct inquiry should be to determine whether *Martin's expert,* Dr. Manlove, provided competent evidence to support Martin's

---

6. On the *Batson* issue, the Court observes that although not dispositive, "it is interesting to note that the empanelled jury consisted of six females and six males." *See supra* ¶ 17. I write only to add that during the trial court hearing on the challenge, Martin also conceded that although the State struck 13 consecutive women, there were obvious, legitimate reasons for striking many of them.

Martin's counsel told the trial court: "Now, of these previous 13, clearly a number of them [ ] are obvious strikes. For example, two women [ ] are wives of defense attorneys in town; another woman [ ] is a patient of Dr. Manlove, and there are obvious reasons for striking some of these people[.]" These facts also support the trial court's decision.

"morally approved by society" theory of insanity.[7] If Dr. Manlove did, and if that theory was a correct statement of the law,[8] the instruction should have been given.

[¶ 49.] However, I concur in result because contrary to the Court's assertion, Martin *did not* present "expert opinion of insanity based upon Defendant's alleged belief that the killing was not morally wrongful." *See supra* ¶ 42. Instead, a review of Dr. Manlove's testimony confirms that his opinion was only based upon the traditional "right versus wrong" theory of insanity. Indeed, when first asked to tell the jury his understanding of the insanity law that he would apply in this case, Dr. Manlove stated, "one needs to be unable to *know the wrongfulness* of their act"; or, if under a delusion, "something that was *right* . . . but . . . would otherwise be considered *wrong*." (Emphasis added.) So also, when asked to express his ultimate opinion on insanity, Dr. Manlove incorporated no societal morality component. Instead, he specifically applied the traditional theory indicating that Martin "did not understand the *wrongfulness* of his acts because in the context of his delusional thinking, these acts were *right* acts." (Emphasis added.) He further testified that Martin believed "what he was doing was *right* rather than *wrong* even though he recognized that it was against the law." (Emphasis added.) Stated another way, Dr. Manlove indicated that Martin "understood the criminality of his act but didn't understand that it was *wrong*." (Emphasis added.) Finally, Manlove opined that Martin "lacked the capacity to know the *wrongfulness* of what he did." (Emphasis added.) Thus, Martin's psychiatric evidence was entirely phrased in terms of the traditional insanity theory incorporating the "wrongfulness" test. In fact, Martin never even asked Dr. Manlove if "wrongfulness" included some component of moral acceptance of his acts by others in society.

[¶ 50.] If anything, Martin's own trial evidence actually refutes his theory of "moral acceptance by others in society." Although Martin's theory involved moral acceptance by *others,* Dr. Manlove first noted that Martin had not even discussed his theory of raising people from the dead with anyone. Thus, Martin introduced no evidence upon which a jury could have found that he had a basis to believe "others" in society would morally accept his act.

[¶ 51.] More importantly, Dr. Manlove specifically refuted the notion that *Martin actually believed* his acts might be approved of by society. Instead, Dr. Manlove testified that "[Martin] *recognized* that *people would think that this was an unusual theory* and, you know—and that *people wouldn't accept it, accept his theory* [.]" (Emphasis added.) Dr. Manlove further conceded that Martin "*recognized* that if he were going to proceed with his— the idea that he could raise somebody from the dead and shoot—kill them and bring them back from the dead this *would be shocking* to people and he didn't want to bring that to their attention." (Emphasis added.) Finally, Dr. Manlove testified unequivocally that Martin himself knew that "*others would think that what he was doing was wrong,* but he hoped that *if he could get away with it,* his act would be helpful to the *victim.*" (Emphasis added.) Thus, Martin's own psychiatric evidence clearly negated the theory that *Martin*

---

7. *See supra* ¶ 35 for Martin's proposed instructions.

8. We need not reach this legal issue because Martin's instructions were not supported by competent evidence. *See infra* ¶¶ 49, 50, and 51.

acted *believing* that the shooting would be morally accepted by *others in society*.

[¶ 52.] Because Martin failed to introduce competent evidence to support his "morality" instruction, I would affirm the conviction on that basis, and I concur in result.

[53.] KONENKAMP, Justice, joins this special writing.