2005 SD 79

**Jon C. BEHRENS and Donald C. Behrens, Plaintiffs and Appellants,**

**and**

**Harry C. Behrens and George T. Behrens, Plaintiffs,**

**v.**

**Melvin D. WEDMORE, Defendant and Appellee.**

**Nos. 22715, 22745.**

Supreme Court of South Dakota.

Argued on Jan. 13, 2004.

Decided June 22, 2005.

Michael F. Marlow, Sheila Woodward, Steven K. Huff of Johnson, Heidepriem, Miner, Marlow and Janklow, Yankton, South Dakota, Attorneys for plaintiffs and appellants.

Daniel F. Duffy, Gregory J. Erlandson of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, South Dakota, Attorneys for defendant and appellee.

ZINTER, Justice.

[¶ 1.] Jon and Don Behrens (jointly referred to as Behrens) owned and operated a funeral home in Rapid City. Without the assistance of legal counsel, they negotiated an agreement to sell their business to Loewen International, Inc. After signing the agreement, Behrens engaged Melvin Wedmore, their long-time attorney, to close the transaction with Loewen. Some time after the transaction was closed, Loewen filed for bankruptcy protection and Behrens were unable to recover the full purchase price they had negotiated. Not satisfied with the outcome of the bankruptcy, Behrens filed this malpractice action against Wedmore. They contended that Wedmore should have better collateralized the transaction, should have advised them of the risks of an installment sale in bankruptcy, and that he charged an unreasonable attorney fee. A jury found for Wedmore on all issues. We affirm.

### Facts and Procedural History

[¶ 2.] Behrens Mortuary was founded in 1879 by Behrens' great-grandfather. It was the second largest funeral home in South Dakota at the time of its sale to Loewen International, Inc. in 1997. Jon and Don began working in this family business in 1970 and 1983, respectively. They enhanced the business in many ways. Despite the success of the business, Behrens believed that they would have to sell it at some time because the next generation of their family was not interested in operating the business.

[¶ 3.] Robert Eastgate, a regional manager for Loewen, contacted Jon in the mid 1990's about buying the business. Jon told Eastgate that they were not interested in selling. Service Corp. International (SCI), Loewen's competitor, also contacted Behrens about buying the business. Behrens again indicated that they were not interested in selling.

[¶ 4.] Loewen continued to pursue the purchase by making a $2 million offer. The terms of this offer included a $1 million cash down payment, with the balance financed by Behrens on a ten-year, interest-free note. After Behrens rejected the offer, Loewen made another offer, this time in the amount of $4.1 million. Behrens responded with a counteroffer. The terms of the counteroffer included a $2.55 million cash down payment and an additional $2 million to be financed by Behrens on an interest-free note payable in ten equal payments.

[¶ 5.] Loewen was eager to acquire Behrens Mortuary because it was fighting a takeover bid from SCI and wanted a presence in the Rapid City market. Consequently, Loewen wrote a letter to Behrens containing the following alternate offers:

1. $4,100,000, which included the entire business, as well as the mortuary property and the retort (crematory) property; or

2. $3,400,000, (with $2,400,000 cash at closing) with a lease of the retort property.

Because the funeral home (mortuary property) was owned by Jon's and Don's fathers, these offers indicated that the mortuary property was included in the purchase price. The offer further indicated that Jon and Don were to determine how to allocate the total purchase price to that part of the business.

[¶ 6.] On March 25, 1997, Behrens responded with a counteroffer informing Loewen that its proposal to purchase the complete package was acceptable with the following changes in price and financing:

1. $2,550,000 cash at closing [$500,000 of this to be allocated to the purchase of the building from Behrens' fathers];

2. 10 equal annual payments of $200,000 commencing on the first anniversary of the Closing Date. (Unsecured promissory note to be defined.)

[¶ 7.] On April 16, 1997, Behrens and Loewen met and executed a writing that incorporated the terms of Behrens' March 25, 1997 counteroffer. Although the document included a provision noting that it was an offer open for acceptance until 5:00 p.m. on April 17, 1997, Behrens signed it the same day, April 16, 1997. By its terms, the writing provided that Behrens agreed to sell the entire business (including the mortuary property owned by their fathers and the crematory owned by Don and Jon) for $4.55 million. $2.55 million was to be paid on closing, and the $2 million balance was to be financed by Behrens on a no-interest, unsecured promissory note. The agreement further provided that closing would occur within ninety days. Loewen also had the right to execute a more detailed purchase agreement that included ancillary documents necessary to transfer all of the business assets.

[¶ 8.] A central issue in this litigation involved the legal characterization of this written agreement. Behrens contended that it was only a non-binding letter of intent. Therefore, Behrens argued that Wedmore was required to use his legal expertise to change the terms and better collateralize the sale in the event of a bankruptcy. On the other hand, Wedmore contended that it was a binding contract,

and that the financing terms, including the $2 million unsecured note, could not have been renegotiated without losing the entire sale. For ease of reference, we refer to this writing as the "Initial Agreement."

[¶ 9.] Two days after signing the Initial Agreement, Behrens first consulted Wedmore about legal representation. According to Jon, they took the Initial Agreement to Wedmore and told him: that they were going to sell Behrens Mortuary; that there would be more information forthcoming; that "if you want to make any changes or anything you want to do to [the Initial] agreement, contact [Loewens];" and, that the "deal" was scheduled to close by June 30, 1997. However, according to Wedmore, he was only to close the transaction based on the Initial Agreement. Therefore, Wedmore contended that he was to review the closing documents and update the corporate records. Wedmore specifically contended that he was not hired to renegotiate the Initial Agreement or to change its terms, including the provision that called for the unsecured promissory note.

[¶ 10.] Negotiations to close the transaction continued over two months. Changes were made even after the July 15, 1997 stated expiration date of the Initial Agreement. During these negotiations, Wedmore contends that he unsuccessfully asked for additional security (including a guarantee, stock pledge, security interest, and letter of credit). He was successful in obtaining a $500,000 contract for deed for the mortuary. Wedmore also drafted a mortgage and promissory note that included interest. Together, these secured transactions reduced the $2 million unsecured indebtedness called for in the Initial Agreement by approximately $1 million. Wedmore

also included bankruptcy-default and cross-default provisions in the contract for deed, promissory note, and mortgage. These provisions were intended to tie the assets together in order to prevent Loewen from defaulting on one, but not all of the assets sold. There was not, however, any cross-collateralization of the contract for deed and the promissory note.

[¶ 11.] The transaction finally closed on July 24, 1997.[1] Sometime after closing, Loewen filed for bankruptcy. The evidence reflects that, as a result of Wedmore's involvement, Behrens were better protected in the bankruptcy than they would have been had they only held the $2 million unsecured note described in the Initial Agreement. However, they were oversecured on the contract for deed and unsecured on the promissory note. Furthermore, the cross-default provisions (purportedly triggered by bankruptcy) and the foreclosure provisions were not fully enforceable in bankruptcy. Consequently, Behrens were unable to get their business back. Furthermore, because the indebtedness was not cross-collateralized, they were unable to use excess equity in the mortuary building (subject to the contract for deed) to secure the promissory note.

[¶ 12.] Behrens alleged that as a result of these problems, they incurred a $462,890 loss in the bankruptcy. They were also required to spend $14,579 in bankruptcy attorney fees. Behrens claimed that if Wedmore had better collateralized the promissory note, they would have been paid in full or they would have gotten their business back. Although Wedmore's efforts resulted in Behrens being better positioned than most other cred-

---

1. Although the Initial Agreement provided for closing within 90 days, Loewen had the right to extend closing for up to 30 days (until August 15, 1997).

itors in the Loewen bankruptcy,[2] Behrens contended that Wedmore committed malpractice. Behrens specifically alleged that Wedmore was negligent in negotiating and preparing the transactional documents and in failing to warn them of the potential risks of an installment sale in bankruptcy.

[¶ 13.] On the other hand, Wedmore's experts testified that Wedmore could not have better collateralized the transaction because the Initial Agreement was legally enforceable and it finalized the terms of the sale, which included the $2 million unsecured note. Under Wedmore's theory, his ability to negotiate for additional security was limited because the Initial Agreement was binding and further security demands risked a loss of the entire sale. He further contended that he did make additional efforts to obtain more security, but those efforts were rejected by Loewen. Wedmore finally contended that Behrens ultimately received approximately $4,088,286 after bankruptcy, which was substantially more than they could have received under the Initial Agreement that they had negotiated on their own.

[¶ 14.] With respect to attorney's fees, there is no dispute that Wedmore charged a 1% transaction fee for the legal services provided. Behrens alleged that the fee was unreasonable. They also alleged that Wedmore breached his fiduciary duty in failing to timely disclose this fee. Wedmore conceded that his fee was not disclosed at the time he was retained; however, he provided expert testimony that the 1% transaction fee was customary in that community and that it was reasonable for the work provided.

[¶ 15.] On appeal, Behrens raise the following issues:

1. Whether Behrens were entitled to summary judgment declaring that the Initial Agreement was a letter of intent, rather than a binding contract;

2. Whether the trial court improperly instructed the jury on contributory negligence and assumption of the risk;

3. Whether the trial court erred in refusing to instruct on Behrens' theory of breach of fiduciary duty in Wedmore's charging the 1% transaction fee;

4. Whether Wedmore had the duty to seek the advice and assistance of a specialist;

5. Whether admission of a business appraisal was prejudicial error;

6. Whether Behrens were entitled to a mistrial based upon Wedmore's method of presenting exhibits;

7. Whether Wedmore was entitled to certain disbursements as a prevailing party.

Wedmore filed a notice of review, raising the following issue:

8. Whether Wedmore was entitled to a directed verdict and/or motion for judgment as a matter of law on the legal malpractice and attorney's fees claims.

**Analysis and Decision**

1. Whether Behrens were entitled to summary judgment declaring that the Initial Agreement was a letter of intent, rather than a binding contract.

[¶ 16.] Behrens argue that their Initial Agreement was merely a "letter of intent" that was not a binding contract. Behrens assert that the legal nature of the Initial

**2.** Behrens received $1.1 million in the bankruptcy, which was $900,000 to $950,000 more than they would have received without Wedmore's closing documents.

Agreement was a question of law for the trial court and that they were entitled to summary judgment on this issue.

[¶ 17.] Wedmore contends that the trial court's denial of summary judgment was appropriate. Wedmore asserts that there were genuine issues of material fact concerning the binding nature of the Initial Agreement. Alternatively, he asserts that the Initial Agreement was a binding contract as a matter of law.

 [¶ 18.] Our standard of review for summary judgment is well-settled:

> In reviewing a grant or denial of summary judgment ... we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and [established] entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party[,] and reasonable doubts should be resolved against the moving party.... Our task

on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. *Braun v. New Hope Township*, 2002 SD 67, ¶ 8, 646 N.W.2d 737, 739 (citing *South Dakota State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.*, 2000 SD 116, ¶ 9, 616 N.W.2d 397, 400–401).

[¶ 19.] The trial court denied summary judgment, concluding that the jury was required to resolve factual issues concerning the conduct and intent of the parties to determine whether the Initial Agreement was a binding contract. The trial court stated: "I think the matter of whether there was a valid contract at that time is a question of fact for the jury. I'll instruct them on contracts and they can make that decision." The trial court ultimately instructed the jury on the principles of law governing the formation of binding agreements as well as preliminary agreements that are not intended to be a final and complete contract.[3]

3. The trial court instructed:

Instruction 48a:

A contract is an agreement between two or more persons consisting of a set of promises that are legally enforceable. For a promise to be legally enforceable, something of value must be bargained for and given in exchange for the promise. This is called consideration.

A contract may be made in any manner sufficient to show agreement. It may be oral or written, or implied from the conduct of the parties. In an implied contract, they are inferred from the circumstances.

Instruction 48b:

A contract is an agreement to do or not to do a certain thing. The essential elements to the existence of a contract are:

(1) Parties capable of contracting;

(2) Their consent;

(3) A lawful object; and

(4) Sufficient cause or consideration.

A contract is either express or implied. The terms of an express contract are stated in words. The terms of an implied contract are manifested by conduct.

Instruction 48c:

Every oral or written contract requires that all parties to the contract consent to the making of the contract. The consent of the parties must be:

1. Free,

2. Mutual, and,

3. Communicated to each other.

Consent is not [m]utual unless (both or all) the parties agree upon the same terms and conditions in the same sense. Consent can be effectively communicated only by some act or omission of the party contracting by which the party intends to communicate it. To constitute consent, the acceptance must be absolute and unqualified.

Instruction 48d:

The parties to a contract may bind themselves with an initial agreement where they agree upon the essential terms of the contract and intend to be bound by the initial agreement, even though they contemplate the execution of a more formal document.

Instruction 48e:

Ensuing negotiations between the parties may be evidence of an absence of intent that an initial agreement constitutes a final and complete contract.

■■ [¶ 20.] We have held that, generally, the "[e]xistence of a valid contract is a question of law." *In re Estate of Neiswender*, 2000 SD 112, ¶ 9, 616 N.W.2d 83, 86 (citations omitted). Questions of law are reviewed de novo. *Regalado v. Mathieson*, 2004 SD 87, ¶ 5, 684 N.W.2d 67, 70 (citation omitted). "If in dispute, [however,] the existence and terms of a contract are questions for the fact finder." *Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn.1992) (citation omitted).

[¶ 21.] Behrens contend that the Initial Agreement was not a binding contract because: (a) it expired; (b) the parties' intent and conduct established that it was a nonbinding agreement; (c) the agreement lacked essential terms and parties; and (d) Behrens received no consideration for the agreement. Although contentions (a), (c), and (d) are often legal questions, and although contention (b) is generally factual in nature, there is some overlap in this case. We therefore examine these contentions and the record to determine whether the Initial Agreement was a nonbinding agreement as a matter of law, and whether there were disputed issues of material fact concerning the formation of a binding contract. Ultimately, if questions of fact existed, or if Behrens were not entitled to summary judgment as a matter of law, no prejudicial error occurred in submitting this issue to the jury.

a. Expiration/ Extension of
the Initial Agreement

■ [¶ 22.] The Initial Agreement was executed on April 16, 1997. It provided that the agreement would expire 90 days after execution and that closing was to occur by June 30, 1997. It also provided that the "[b]uyer may extend this date by up to 30 days on account of title, environmental, survey, or appraisal matters and receipt of government approvals." The actual closing took place on July 24, 1997, after the scheduled closing and after the stated expiration date, but within the time permitted for extensions.

[¶ 23.] Behrens argue that because closing took place after the initial expiration date, the Initial Agreement had expired, and therefore, Wedmore was free to obtain better terms of financing. Behrens raise a number of factual and legal points in support of this argument. Behrens contend that factually, "Wedmore's conduct in negotiating major changes ... after July 15 belies his recent claim" that the Initial Agreement did not expire. They also point out that as late as September 1997, Wedmore had argued to Loewen that the Initial Agreement had expired.[4] Behrens finally contend that they "never authorized Wedmore to extend" the Initial Agreement. Behrens ultimately argue the legal point that "if the ensuing negotiations significantly altered the original agreement, the original agreement was not a 'final and complete' contract."

[¶ 24.] Wedmore concedes that closing occurred after the expiration date, but he points out that regardless of Behrens' current contentions, they had always indicated that they had negotiated a binding contract. Wedmore further contends that Behrens never indicated that they did not want to close the Initial Agreement, and the parties never extinguished (*see* SDCL 53–11–1) or rescinded (*see* SDCL 53–11–2) the Initial Agreement.

[¶ 25.] These arguments (and the record) demonstrate the existence of disputed

---

4. This argument was made in response to Loewen's belated request for an interest-free promissory note. Although the Initial Agreement called for interest-free financing, the promissory note required interest. Wedmore contends that he was merely "jawboning" Loewen in an attempt to save this interest provision in the note.

issues of material fact concerning the expiration or extension of the Initial Agreement. While Behrens have identified evidence of negotiations and term changes after the expiration date that could suggest that the Initial Agreement may have expired, Wedmore has identified evidence that an extended closing date was legally authorized and factually agreed to by Behrens. In light of this dispute of fact, the trial court correctly denied summary judgment and instructed the jury on contract formation. Those instructions specifically included directions on the requisites of binding initial agreements and the fact that ensuing negotiations may be evidence of the absence of a binding agreement. (*See* Instructions 48d and 48e at n. 3, *supra* ).

b. Intent and Conduct of the Parties

■ [¶ 26.] Behrens argue that because the Initial Agreement states "that it was drafted in 'contemplation' of a future transaction between the parties," it was only intended to be a "springboard" or "starting point" for a completed transaction. They further argue that the subsequent negotiations were "strong evidence" that the initial agreement was not "a final and complete contract." Behrens specifically assert that "the buyer changed, the terms changed, the contract, note and mortgage came to fruition, and the cross default provisions were added."

[¶ 27.] Although changes did occur, we observe that the Initial Agreement was very detailed and specific, and it did include a clear offer and acceptance of terms necessary to form a contract.[5] Although the Initial Agreement did "contemplate" a more formal purchase agreement with necessary closing documents, it explicitly stated that it was an "offer for the purchase" of Behrens Mortuary. Moreover, Jon's and Don's signatures indicated that the "OFFER [was] ACCEPTED AND AGREED." We also note that Behrens' current claim

---

5. It contained the following unambiguous provisions evincing the existence of a binding contract:

> We are pleased to present the following *offer* for the purchase from the Seller of all of the issued and outstanding shares (the "Shares") of Behrens Mortuary, Inc. ("Company") together with *all of the business assets held or owned by the Seller (including, but not limited to the real property located at 865 Century Road, Rapid City, South Dakota 57701) and used in connection with the operation of the Company's funeral home and crematory business* (collectively, the "Additional Assets") by Loewen Group International, Inc., or its nominee ("Buyer"):
>
> 1. Consideration: Buyer *will pay* to the Seller in exchange for the Shares, the Additional Assets and the covenant not to compete described under paragraph 2 below, all free and clear of liens and encumbrances, the total price of $4,550,000 (the "Purchase Price"),....
>
> 13. Definitive Agreement: Upon signing of this letter, Buyer will draft and the parties will negotiate in good faith a more detailed purchase agreement

(the "Purchase Agreement"), provided however *Buyer may waive this condition at any time*. The Purchase Agreement will encompass all of the terms and conditions set forth in this letter together with representations, warranties and indemnities and other terms and conditions normally necessary for a transaction of this nature in the State of South Dakota....

> 18. Buyer's Conditions to Closing: This *offer* and the transaction contemplated herein is subject to ... [certain contingencies]....
>
> 19. 1031 Exchange: Buyer will covenant to cooperate with Seller to have the transaction completed in the most tax efficient manner for Seller (i.e., a 1031 exchange for the real estate) provided that such structuring be at no additional cost to Buyer.
>
> 20. Expiry Date: This *offer* is open for *acceptance* until 5:00 p.m. Central time, April 17, 1997.
>
> Signature line: "ABOVE *OFFER ACCEPTED* AND AGREED BY SELLER."
>
> /s/ Jon Behrens
> /s/ Donald Behrens

(Emphasis added.)

that they did not consent or intend to be bound by the Initial Agreement is inconsistent with Don's admission at trial that by signing the Agreement he agreed to its contents.

[¶ 28.] Therefore, there was evidence suggesting that the Initial Agreement was intended to be a binding contract with only additional closing documents contemplated. Although there was also other evidence suggesting that the Initial Agreement may not have been intended to be the final binding agreement, that dispute of fact made the existence and terms of a contract a question for the jury. *Morrisette*, 486 N.W.2d at 427 (citation omitted). Ultimately, "[w]hether a contract is formed is judged objectively by the conduct of the parties, not by their subjective intent." *Geraets v. Halter*, 1999 SD 11, ¶ 17, 588 N.W.2d 231, 234 (citation omitted). Accordingly, the trial court properly instructed the jury on the requisites of a binding contract and on Behrens' factual theory that "[e]nsuing negotiations between the parties may be evidence of an absence of intent that an initial agreement constitutes a final and complete contract." Although the jury did not adopt Behrens' theory, considering the conflicting evidence concerning the parties' conduct and intent, we conclude that the trial court did not err in refusing to grant summary judgment on this issue.

c. Essential Terms of a Contract

■ [¶ 29.] Behrens point out that in order for a valid contract to exist there must be mutual consent to the same terms. In other words, the requisite parties must "agree upon the same thing in the same sense." *See* SDCL 53–3–3. Behrens argue that the mortuary building was the "crown jewel" of the acquisition and that there was no term agreeing to the purchase price for that asset in the Initial Agreement. Absent a purchase price for this asset, Behrens argue that the parties did not come to an agreement on this essential term, and therefore, no binding contract existed.

[¶ 30.] Wedmore responds that "[t]he price allocated to the mortuary building had no bearing on the agreed upon *purchase price* of the *entire business*—the object of the contract." Wedmore also points out that "the parties all agreed that there was never any question [that] the building was available for sale as indicated in the Initial Agreement." We agree with Wedmore.

■ [¶ 31.] In doing so, we point out that although the *allocation* of the purchase price to the mortuary building was not initially finalized, the total purchase price for all assets had been agreed to. Therefore, there was sufficient evidence to find that the Initial Agreement contained parties capable of contracting [6] and their mutual consent [7] to the same terms. *See* SDCL 53–1–2, 53–3–3. The contract did not fail as a matter of law for uncertainty as to parties or consent to the purchase price of the assets.

---

6. Although Behrens argue that the parties changed, there was evidence that the change was a mere clarification that a subsidiary, rather than the parent company, would be buying the business.

7. To the extent that Behrens argue their fathers were necessary to consent to a sale of the building, we point out that a party may bind themselves to a contract that requires performance by a third-party. "Even if the party relies on a third party for performance, the party has also undertaken the risk that the third party will not adequately perform, and cannot be discharged from the contract because of the third party's nonperformance." *Richland State Bank v. Household Credit Services, Inc.*, 340 F.Supp.2d 1051, 1057 (D.S.D. 2004) (citation omitted).

#### d. Failure of Consideration

 [¶ 32.] Behrens argue that Loewen's promise to pay under the Initial Agreement was "illusory." They contend that the Initial Agreement had "so many contingencies running unilaterally in Loewen's favor that Behrens could never enforce that document against Loewen." They also contend that the agreement was unenforceable because Loewen did not pay them to sign the Initial Agreement, and therefore, they received no consideration.

[¶ 33.] However, "consideration" is defined as:

> [a]ny benefit conferred *or agreed to be conferred* upon the promiser by any other person to which the promiser is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser, is a good consideration for a promise.

SDCL 53–6–1 (emphasis added). Therefore, the agreement by Loewen to pay in the future was sufficient consideration. We further note that the contingencies that ran "unilaterally" in Loewen's favor were not essential terms of the contract. Rather, they were contingencies that customarily accompany binding contracts such as (1) "satisfactory completion of a due diligence review," (2) "[b]uyer obtaining financing," and (3) "approval by the Board of Directors." It is also significant that these contingencies did not fail, and therefore, they did not make the Initial Agreement unenforceable. *See Johnson v. Coss,* 2003 SD 86, ¶ 13, 667 N.W.2d 701, 705–706.

[¶ 34.] Because the Initial Agreement contained mutual promises, and because the mutual promises and the promise to pay were both sufficient consideration, the trial court did not err in declining to grant summary judgment on the allegation of failure to receive consideration. *See Heinert v. Home Federal Sav. & Loan Ass'n,* 444 N.W.2d 718, 721 (S.D.1989) (citation omitted).

#### e. Conclusion

[¶ 35.] There was evidence that the Initial Agreement was a binding contract that was extended. The Initial Agreement included parties capable of contracting, their consent to essential terms, a lawful object, and sufficient consideration. The Initial Agreement also included specific provisions relating to additional details like environmental matters, OSHA, ADA, title insurance, financial statements, inventory, and debt. Considering the terms of the Initial Agreement, summary judgment in favor of Behrens was precluded as a matter of law. Additionally, because of the numerous disputes of fact concerning contract formation, the trial court correctly submitted that issue to the jury.

2. Whether the trial court improperly instructed the jury on contributory negligence and assumption of the risk.

[¶ 36.] Wedmore argued that Behrens were contributorily negligent and assumed the risk by entering into the Initial Agreement without obtaining legal advice. Wedmore introduced expert testimony that the terms of the Initial Agreement were binding and prevented him from negotiating terms that would better collateralize the note. Therefore, over Behrens' objection, the trial court instructed the jury that contributory negligence and assumption of the risk were defenses to Behrens' malpractice claim.[8]

8. Instruction 39:

Plaintiffs cannot recover damages if they were contributorily negligent and their

[¶ 37.] Our review of jury instructions is settled.

Under our standard of review, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law. If, as a whole, the instructions misled, conflicted, or confused, then reversible error occurred. The party charging that an instruction was given in error has the dual burden of showing that the instruction was erroneous and prejudicial. An erroneous instruction is prejudicial if in all probability it produced some effect upon the verdict and is harmful to the substantial rights of the party assigning it.

*First Premier Bank v. Kolcraft Enterprises, Inc.*, 2004 SD 92, ¶ 40, 686 N.W.2d 430, 448 (internal citations omitted).

### a. Contributory Negligence

[¶ 38.] Behrens assert that the contributory negligence instructions were improper because their negligence, if any, in negotiating the Initial Agreement was made before Wedmore was hired. Behrens argue that "if a professional accepts a duty to serve a client, the professional is [thereafter] liable for negligence in the performance of that duty regardless of how or why the client got involved in the matter in which the professional was retained." We generally agree.

[¶ 39.] As the Utah Supreme Court noted:

[A] preexisting condition that a professional is called upon to resolve cannot be the cause, either proximate or direct, of the professional's failure to exercise an appropriate standard of care in fulfilling his duties. To decide otherwise would allow professionals to avoid responsibility for the very duties they undertake to perform. A doctor, for example, might be able to avoid liability for negligently treating an injured person because the patient negligently had run a traffic light and was injured. Such a result would be clearly unsound.

*Steiner Corp. v. Johnson & Higgins of California,* 996 P.2d 531, 533 (Utah 2000) (internal citation omitted); *see also Stroud*

contributory negligence was a proximate cause of their damage except as provided in the next instruction.
Instruction 40:
If you find Plaintiffs were contributorily negligent, they may still recover damages for their damage if you find that their contributory negligence was slight compared with the negligence of MELVIN WEDMORE.
If you find Plaintiffs' contributory negligence was more than slight compared with the negligence of MELVIN WEDMORE, they cannot recover.
"Slight" means whether Plaintiffs' negligence was small in comparison with the negligence of MELVIN WEDMORE.
If you find Plaintiffs' contributory negligence was slight and that they are still entitled to recover, then the damages must be reduced in proportion to the amount of []their contributory negligence.
Instruction 41:

DON BEHRENS & JON BEHRENS cannot recover damages if they assumed the risk by voluntarily placing themselves at risk or voluntarily continuing at risk when they knew the risk.
MELVIN WEDMORE must show that DON BEHRENS & JON BEHRENS not only knew the specific risk and appreciated its character, but also that they voluntarily assumed the risk. MELVIN WEDMORE must also show that DON BEHRENS & JON BEHRENS had sufficient time, knowledge and experience to make an intelligent choice.
Instruction 42:
There is a distinction between the defenses of assumption of risk and contributory negligence. Contributory negligence must be a proximate cause of the damage. Assumption of risk, however, bars recovery of damages although it did not cause the damage but merely exposed the person to damage. The same conduct may be both contributory negligence and assumption of the risk.

*v. Arthur Andersen & Co.,* 37 P.3d 783, 790 (Okla.2001). Thus, if a professional accepts a duty to serve a client, the professional is generally liable for negligence in the performance of that duty regardless of how or why the client became involved in the matter for which the professional was retained. *Steiner,* 996 P.2d at 533.

■■■■ [¶ 40.] This, of course, is not to say that a professional is responsible for *the pre-existing condition* that was the proximate cause of the client's injury. The professional is not. *Staab v. Cameron,* 351 N.W.2d 463, 466 (S.D.1984) (stating that attorney is not responsible for a client's loss when client entered into a valid contract *before* seeking attorney representation). Thus, there is no liability where there was nothing that the attorney could have done to remedy the harm that was already and inexorably in place before the attorney agreed to represent the client. *Id.* In those circumstances, "the overwhelming majority [of courts] have recognized that a client's recovery for legal malpractice can be either entirely foreclosed, or proportionally diminished, as the result of his or her own negligence." *Gorski v. Smith,* 812 A.2d 683, 698 (Pa.Super.Ct.2002). *See also* Susan L. Thomas, J.D., Annotation, *Legal Malpractice: Negligence or Fault of Client as Defense,* 10 A.L.R.5th 828 (1993–2004) (noting in a legal malpractice claim the "usual defenses are applicable, including the defense that the client contributed to or was solely responsible for his or her own harm"); *Shaw v. State of Alaska, Dep't. of Admin.,* 861 P.2d 566 (Alaska 1993) (recognizing contributory negligence and assumption of the risk as traditional defenses to legal malpractice claim); *Western Fiberglass, Inc. v. Kirton, McConkie and Bushnell,* 789 P.2d 34, 36 (Utah Ct.App.1990) (affirming judgment that plaintiff was equally negligent in action against a law firm because plaintiff failed to keep the law firm fully

informed and failed to be represented by counsel at closing of a transaction).

■■■ [¶ 41.] Moreover, in this case, the trial court modified the general contributory negligence instructions to ensure that, to the extent the Initial Agreement was not the proximate cause of Behrens' loss, the jury would not apply Behrens' contributory negligence to Wedmore's post-Initial Agreement representation. The trial court did so by specifically instructing the jury that:

> Instruction 44a:
>
> A client who retains an attorney to perform legal services has a justifiable expectation that the attorney will exhibit reasonable care in the performance of those services. The client is under no duty to guard against the failure of the attorney to exercise the reasonable standard of professional care in the performance of the legal services for which the attorney was retained. A client cannot be found contributorily negligent for failing to anticipate or guard against his attorney's negligence in the performance of legal services within the scope of the attorney's representation of the client.

Thus, the jury was specifically instructed that Behrens could expect to receive reasonable care, that they were "under no duty to guard against" any negligence of Wedmore for the services for which he was retained, and that Behrens could not be contributorily negligent by failing to anticipate or guard against Wedmore's negligence that was within the scope of his post-Initial Agreement representation.

[¶ 42.] We finally observe that the modified contributory negligence instructions were supported by the evidence. A number of Wedmore's expert witnesses testified that because of the terms of the Initial Agreement, an attorney exercising due care could not have obtained a more

favorable result in the bankruptcy. Wedmore's experts first opined that if a client came in and stated that they had made a "deal" for the sale of their business, had signed an agreement, and it looked like the Initial Agreement in this case, the standard of care was that an attorney would conduct himself as if they had made a binding agreement. Another expert opined that "having no evidence that the clients were telling me to get out of this agreement," he would treat the agreement as a starting point, i.e., what the client wanted, and he would try to get it closed. Another expert indicated that Behrens had negotiated their best deal before they came to see Wedmore, and as such, the next step for a transaction lawyer was to get the deal closed.

[¶ 43.] With respect to getting additional collateral or security in anticipation of bankruptcy, Wedmore introduced expert testimony that an attorney's duty to get more security was dependent upon when that attorney came into the transaction. In this case, there was evidence that because the Initial Agreement indicated that the storage facility and the mortuary were to be delivered free and clear of any liens or encumbrances, Wedmore went "out on a limb" to even ask for additional security for his clients. Another expert indicated that because Behrens did not

come to Wedmore early on to ask how to negotiate this sale, there were "a lot of things they didn't do that precluded [Wedmore] from having the opportunity to look at a lot of things." Finally, with respect to the proximate cause of Behrens' loss, one expert, who has practiced bankruptcy law since 1978, opined that Behrens were actually paid more in the bankruptcy than the value of their collateral, and therefore, even if there had been a stacking of mortgages, Behrens' recovery in bankruptcy would not have changed.[9]

[¶ 44.] Thus, there was evidence that Behrens' conduct in negotiating the Initial Agreement without professional assistance was the sole proximate cause of their loss. Considering this expert testimony, the jury could have found that the Initial Agreement was binding, that it proximately caused Behrens' damages, and that nothing Wedmore did in his subsequent representation contributed to Behrens' loss. Under these circumstances, the trial court did not err in giving its contributory negligence instructions.

#### b. Assumption of the Risk

[¶ 45.] In order to assume the risk of one's own loss, a person must know that the danger exists, appreciate the character of the danger, and "voluntarily accept such risk by having a sufficient

---

9. Wedmore points out that Behrens were unable to demonstrate that any duty allegedly breached by Wedmore was the proximate cause of any harm. Specifically, Wedmore points out that Behrens failed to present any evidence that "any additional security, cross-collateralization or other changes" were "available or even possible." Wedmore points out that attorney Brent Wilbur, a bankruptcy expert, "confirmed that preexisting banking arrangements prevented Loewen from granting additional security." In addition, Wedmore notes that Robert Eastgate, the Loewen regional manager called by Behrens:

testified he could not state that any additional security was available to be pledged back to Behrens; that the vast majority of funeral home sellers carried unsecured promissory notes with Loewen; that these funeral home sellers carried unsecured promissory notes because Loewen borrowed hundreds of millions of dollars for acquisition down payments; and that the assets of these funeral homes had to be pledged back to the banks providing the underlying financing.

Wedmore finally points out that Behrens produced no evidence contradicting Wilbur or Eastgate, and therefore, Behrens did not prove their case.

amount of time, knowledge, and experience to make an intelligent choice." *Parker v. Casa Del Rey–Rapid City, Inc.,* 2002 SD 29, ¶ 11, 641 N.W.2d 112, 117 (citation omitted), *declined to follow on other grounds by State v. Martin,* 2004 SD 82, 683 N.W.2d 399. Behrens contend that they could not have assumed the risk because they knew nothing about bankruptcy.

[¶ 46.] This contention requires us to consider whether Behrens could have been charged with knowledge of the risk by negotiating the Initial Agreement without the assistance of counsel. On that issue, we observe that Wedmore's expert testimony indicated that experienced business people should know that when one makes a loan there is a risk of nonpayment. Here, by the terms of the Initial Agreement, Behrens clearly agreed to assume the risk of a $2 million unsecured loan. Even after the security Wedmore obtained, Behrens remained saddled with an approximate $1.5 million note secured by a mortgage on property worth only $425,000. Consequently, according to one expert, Behrens "had to know that they weren't fully protected because they've got … a note secured by an asset worth" substantially less than the value of the note. Considering all of the evidence, Behrens must be charged with the knowledge that by negotiating a $2 million *unsecured* loan, they incurred a risk of not being repaid in full.

[¶ 47.] We, therefore, agree that there was sufficient evidence to charge these businessmen with having voluntarily assumed the risk of agreeing to a $2 million unsecured note. Because there was sufficient evidence for Behrens to be charged with knowledge of the risk of making an unsecured loan, the trial court did not err in giving an assumption of the risk instruc-

tion. *See Vann v. Commonwealth of Pennsylvania, Unemployment Compensation Bd. of Review,* 508 Pa. 139, 494 A.2d 1081, 1086 (1985) (stating that a layperson who represents himself in legal matters must, to an extent, "assume the risk that his lack of expertise and legal training will prove his undoing"); *Morrison v. MacNamara,* 407 A.2d 555, 567–68 (D.C.Cir.1979) (noting that assumption of the risk as a defense, although difficult to prove and rarely sustained, is a defense to a professional negligence claim).

3. Whether the trial court erred in refusing to instruct on Behrens' theory of breach of fiduciary duty in Wedmore's charging the 1% transaction fee.

[¶ 48.] Although Wedmore had represented Behrens for many years, a dispute arose over the reasonableness of Wedmore's attorney fee. Behrens apparently assumed that Wedmore would bill on an hourly basis as he had historically done. However, Wedmore billed both Don and Jon a flat fee of $18,625 each ($37,250), which was a 1% transaction fee on the sale price of the business. Although there are disputes about the fee conversations that took place between the parties, there is no dispute that the transaction fee was not communicated to Behrens until three months after Wedmore was retained and after most of the legal services had been provided.

[¶ 49.] Behrens paid the bills and sued, claiming the fee was unreasonable. At trial, Wedmore submitted expert evidence that his bill was reasonable and customary for this type of transaction in that community. Behrens did not introduce contrary evidence suggesting that the fee was unreasonable.[10] Furthermore, Behrens failed to submit expert evidence

---

10. "The rule is well established that as to

contracts made between an attorney and his

reflecting an attorney's fiduciary duties in charging fees. Instead, Behrens only argued: (1) that the fee was unreasonable; (2) that they were entitled to a breach of fiduciary duty instruction as a matter of law because the fee was unreasonable and because Wedmore failed to notify them of the fee within the time required by South Dakota Rule of Professional Conduct 1.5(b)[11]; and (3) that they were entitled to have the jury determine the reasonableness of the fee.

■ [¶ 50.] The trial court granted Behrens' latter request by submitting the reasonableness of the fee to the jury. However, the trial court declined to give the requested breach of fiduciary duty instruction, essentially granting a partial directed verdict on one of Behrens' two theories challenging the reasonableness of the fee. The trial court acknowledged that a lawyer has a legal duty under the Rules of Professional Conduct to charge a reasonable fee and to timely communicate the basis of the fee to the client. However, the trial court repeatedly asked for authority that the failure to follow these requirements was a breach of a *fiduciary* duty.

client subsequent to employment[,] which are beneficial to the attorney, it is incumbent on the attorney to show that the terms are fair and reasonable and fully known and understood by the client." *Baye v. Grindlinger*, 78 A.D.2d 690, 690, 432 N.Y.S.2d 624 (N.Y.App. Div.1980); *Matthews v. Berryman*, 196 Mont. 49, 637 P.2d 822, 825 (1981). Furthermore, "[t]here is a presumption of unfairness or invalidity attaching to a contract for compensation made after the relationship has been established and the burden is on the attorney to show it was fairly and openly made, that the client was fully informed concerning it and understood its effect." *Lawrence v. Tschirgi*, 244 Iowa 386, 57 N.W.2d 46, 48 (1953) (citations omitted). However, even in the absence of a showing that the agreement was openly made and understood, the attorney may still recover the reasonable value of his services. In such a case "the burden is on [the attorney] to establish its fairness...." *Id.* at 53. The "attorney's burden to show the fairness of the contract requires a showing that the ... fee does not exceed the fair value of the services performed." *Id.*

The only record evidence on this issue is that the fee did not exceed the fair value of the services rendered. Wedmore proffered substantial expert testimony that the 1% transaction fee was reasonable and customary in the Rapid City area at the time for the services that were provided. That evidence was unrefuted by expert testimony from Behrens.

11. The 2004 version of South Dakota Rule of Professional Conduct 1.5(b) is analytically similar to the 1988 version that was before the trial court. South Dakota Rule of Professional Conduct § 1.5 (2004) provides:

(a) A lawyer shall not make an arrangement for, charge, or collect an unreasonable amount for fees or expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.
(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

Because no authority was submitted,[12] the trial court declined to instruct on breach of fiduciary duty.[13] As previously mentioned, the trial court did, however, submit the reasonableness of the fee dispute to the jury, instructing them to consider the issue under the factors set forth in Rule of Professional Conduct 1.5.[14]

[¶ 51.] In analyzing this issue, we see no legal error because a failure to charge a reasonable fee or a failure to timely communicate the basis of a fee in violation of Rule 1.5 does not automatically establish a breach of a fiduciary duty. Rather:

> "[v]iolation of a Rule [of Professional Conduct] should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability."

12. In response to the trial court's repeated request for authority, Behrens merely relied upon authority generally imposing the duty to communicate the basis of the fee as reflected in the Restatement (Third) of The Law Governing Lawyers § 38 (2000), the South Dakota Rules of Professional Conduct § 1.5 (2004) (which is analogous to the South Dakota Rule of Professional Conduct § 1.5(b)(1988)), and *In re Discipline of Dorothy*, 2000 SD 23, ¶ 26, 605 N.W.2d 493, 501 (stating that Model Rule 1.5(b) "imposes an affirmative duty on attorneys to provide information about billing practices to their clients"). These authorities require an attorney, before or within a reasonable time after beginning to represent a client, to communicate to the client the basis or rate of the fee, unless there is an historic relationship that makes the communication unnecessary. The only other authority counsel produced were the annotations for requested jury instruction 25, a South Dakota pattern jury instruction. However, neither proposed instruction 25 nor any of the eight authorities referenced in that instruction suggest that a fee dispute of this nature involves a breach of fiduciary duty. On the contrary, all of these authorities simply restate the general duty to communicate the basis of the fee. In the final analysis, Behrens' counsel could only argue "I think a lawyer automatically has a duty, so if a lawyer has a duty to do it, it's a fiduciary duty." Obviously, this was not a correct statement of the law. In response to this argument, the trial court correctly noted that Behrens' argument "would be a major change in legal malpractice laws in South Dakota, that every duty a lawyer has is a fiduciary duty."

Moreover, one of Behrens' authorities actually supported the trial court's decision to submit this dispute to the jury only under the reasonableness factors discussed hereafter. *See Kirby v. Liska*, 214 Neb. 356, 334 N.W.2d 179, 183 (1983) (utilizing the factors adopted by the trial court in instruction 48 and South Dakota Rule of Professional Conduct § 1.5 as guides in determining the reasonableness of a fee).

13. "The existence of a [fiduciary] duty and the scope of that duty are questions of law for a court to decide." *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 839 (S.D.1990) (citations omitted).

14. *See supra* n. 11 and instruction 48, which provide:

> An attorney's fee shall be reasonable. The following factors may be considered in determining the reasonableness of a fee:
> 1. The time and labor involved.
> 2. The novelty and difficulty of the questions involved and the skills requisite to perform the legal service properly.
> 3. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
> 4. The fee customarily charged in the locality for similar circumstances.
> 5. The amount involved and the results obtained.
> 6. The time limitations imposed by the client or by other circumstances.
> 7. The nature and length of the professional relationship with the client.
> 8. The experience, reputation and ability of the lawyer performing the services.
> 9. Whether the fee is fixed or contingent.

*Standish v. Sotavento Corp.*, 58 Conn.App. 789, 755 A.2d 910, 915 (2000) (citing *Mozzochi v. Beck*, 204 Conn. 490, 529 A.2d 171, 176 n. 8 (1987)) (quoting the Rules of Professional Conduct, Preamble (1986)). This is not to say that other violations of the rules would not establish a breach of fiduciary duty. On the contrary:

> [u]nlike the disciplinary rules regarding negligent conduct, the ethics rules concerning the fiduciary obligations commonly are cited by the courts in civil damage actions regarding the propriety of the attorney's conduct. One reason for this difference in usage is that the disciplinary rules concerning the fiduciary obligations often are reasonably accurate statements of the common law....

2 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 14.5 at 551 (5th ed. 2000). Thus, as is explained below, fiduciary rules such as Rule 1.6 regarding confidentiality, Rule 1.7 and 1.8 regarding conflicts of interest, and Rule 1.9 regarding adverse representation may establish a breach of fiduciary duty. *See generally id.* §§ 14.5–14.7.

[¶ 52.] A breach of fiduciary duty in the attorney-client relationship "arises from the representation of a client and involves the fundamental aspects of an attorney-client relationship. The fiduciary obligations are twofold: (1) confidentiality; and (2) undivided loyalty." *Id.* § 14.2 at 535. Thus, "[t]he phrase 'fiduciary breach'... is no more descriptive than the phrase 'legal malpractice[;]' [and a] cause of action for fiduciary breach requires a breach of confidence, a breach of loyalty, or both." *Id.* at 536–537.[15] Therefore, "[a]lthough the attorney functions in a fiduciary relationship, a wrong by an attorney does not thereby become a fiduciary breach." *Id.* at 537. "[T]he courts have recognized that claims of negligence [breach of duty], which do not implicate a duty of confidentiality or loyalty, do not support a cause of action for fiduciary breach." *Id.*

[¶ 53.] In this case, Behrens were not entitled to a breach of fiduciary duty instruction because they were unable to establish that the failure to communicate the basis of the fee, or the dispute over the reasonableness of the fee, involved a breach of a *fiduciary* duty; i.e., one involving confidentiality or loyalty. We note that numerous courts have discussed breach of fiduciary duty when an attorney embezzles,[16] engages in conflicts of interest, or violates obligations of loyalty, thus violating the common-law duty of a fiduciary.[17] However, no such facts were

---

**15.** The cause of action for the breach of loyalty or confidentiality has been summarized and defined as follows:

> A breach of the duty of "undivided loyalty" has been found in two basic situations. The first is when an attorney obtains a personal advantage, whether consisting of an acquisition from the client, a joint venture with the client, or usurpation of an interest in, or opportunity concerning, the subject matter of the retention. Second, the duty of undivided loyalty is imperiled when there are circumstances that create adversity to the client's interest. These circumstances may consist of an existing, personal adverse interest of the attorney, an interest of a prior or subsequent client, or conflicting interests

of present and multiple clients. A breach of confidentiality, outside of the context of adverse representation, has been rare and involves an unauthorized and unprivileged use or disclosure of a client's confidences. The terms of the engagement between the lawyer and client can bear on the scope of the fiduciary duties.

*Id.* at 538.

**16.** *Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259 (S.D.1988).

**17.** For examples, *see Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex.1999) (stating that "[a]n attorney's compensation is for loyalty as well as services, and his failure to provide either

presented in this case. Therefore, we believe that, absent some showing of misuse of trust, conflict of interest, breach of loyalty, or other conduct involving honesty and fair dealing in the attorney-client relationship, an untimely disclosure and subsequent disagreement over the reasonableness of a fee does not *necessarily* involve a breach of a fiduciary duty.[18]

[¶ 54.] Finally, even if a fiduciary instruction were appropriate, we see no prejudice because the reasonableness of the fee was submitted to the jury. As Wedmore points out, even "[t]he relief [Behrens] sought under the breach of fiduciary duty claim concerned excessive attorney's fees," and "the jury was allowed to consider the reasonableness of Wedmore's fees under ... Rule ... 1.5."[19] Therefore, we agree that even if a breach of fiduciary duty instruction had been warranted, Behrens were not prejudiced because the jury was permitted to consider Behrens' only request for relief.[20]

[¶ 55.] In summary, Behrens cited no facts or authority that a reasonableness dispute or a failure to timely communicate a fee arrangement was *automatically* and *necessarily* a breach of a *fiduciary* duty. Therefore, the trial court did not err in declining to give such an instruction. We have often held that the failure to cite authority in support of an issue at trial is a waiver of the right to present that issue on appeal. *State v. Pellegrino*, 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599 (citations omitted). Furthermore, considering the lack of Behrens' evidence and the trial court's submission of the fee dispute to the jury on an alternate theory, Behrens have failed to establish prejudicial error.

4. Whether Wedmore had the duty to seek the advice and assistance of a specialist.

[¶ 56.] Behrens contended that Wedmore "failed to adequately advise them about the risks of the installment transac-

---

impairs his right to compensation."); *Hendry v. Pelland*, 73 F.3d 397, 401 (D.C.Cir.1996) (recognizing that "a basic fiduciary obligation of an attorney is the duty of 'undivided loyalty,' which is breached when an attorney represents clients with conflicting interests"); *Rice v. Perl*, 320 N.W.2d 407 (Minn.1982) (finding breach of fiduciary duty in negotiating class-action settlements by failing to tell clients that the adjuster for the defendant insurance company was also employed by counsel at the same time the settlements were being negotiated).

18. In *Garrett*, 459 N.W.2d at 837, this Court stated that "[a] fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another*. A fiduciary is a person with a duty to *act primarily for the benefit of another*." (Emphasis in original) (quoting *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1241 (1982)). Additionally, "South Dakota law reflects 'the traditional view that fiduciary duties are not inherent in normal arm's-length business relationships, and arise only when one undertakes to act

primarily for another's benefit.'" *Nelson v. WEB Water Development Ass'n, Inc.*, 507 N.W.2d 691, 698 (S.D.1993) (citations omitted). This does not suggest a fiduciary duty arises in charging a fee.

19. *See supra* n. 14.

20. The record reflects that Behrens did not plead or propose instructions seeking a *forfeiture* of the fee based upon a breach of fiduciary duty. Forfeiture could arguably be permitted if the failure to communicate the basis of the fee was a "clear and serious" violation of an attorney's duty under the Rules of Professional Conduct. *See* Restatement (Third) of The Law Governing Lawyers § 37. However, because many violations of legal duties do not "significantly harm" a client, *forfeiture* of fees is not always justified. *Id.* cmt. b. Because Behrens did not plead or propose instructions regarding forfeiture, we do not consider whether full or partial forfeiture would have been an appropriate remedy for Wedmore's disclosure violation under Rule of Professional Conduct 1.5(b).

tion, and particularly about the risks of bankruptcy." An expert testified that Wedmore should have advised them of the risk of nonpayment, stating that there is no meaningful way to talk about risks without talking about bankruptcy.[21] Behrens further contended that Wedmore had no experience in bankruptcy and that he used the same strict foreclosure and default language in his documents for over thirty years. Therefore, Behrens contended that Wedmore had a duty to refer Behrens to a specialist. Behrens argue that "an attorney has a duty to refer his client to a specialist if under the particular circumstances a reasonable and prudent attorney would do so."

[¶ 57.] Behrens unsuccessfully proposed a jury instruction, based on that used in medical malpractice cases, which imposed a qualified duty to refer to a specialist. Our standard of review for the refusal to give a proposed jury instruction in civil cases is abuse of discretion. *Luke v. Deal*, 2005 SD 6, ¶ 11, 692 N.W.2d 165, 168. Moreover, the trial court does not err if its instructions properly present the issue to the jury. *See State v. Janklow*, 2005 SD 25, 693 N.W.2d 685 (stating that, where the trial court rejected certain instructions because the principles were already covered by other instructions, the trial court did not abuse its discretion).

[¶ 58.] Here, the trial court did not give Behrens' specific instruction, but it did instruct the jury on this issue by specifically instructing that an attorney has a duty to advise a client of all information an attorney knows *or should know that a reasonable client would attach significance to in deciding to take a course of action.* The trial court instructed:

> Instruction 47:
>
> An attorney must disclose to the client *all material information necessary* for the client to make an *informed decision* regarding the proposed course of action.
>
> Information is material if the attorney knows or *should know that a reasonable client would attach significance to the information when deciding whether to take the proposed course of action.*

(Emphasis added). The trial court further instructed:

> Instruction 46:
>
> An attorney has a duty to disclose to the client the proposed course of action, the material benefits and risks, the likelihood those risks will occur and the consequences. *If an alternative is reasonably appropriate,* the attorney has a duty to disclose *the material benefits and risks associated with that alternative* as well.

(Emphasis added). The trial court finally instructed the jury to determine whether Wedmore possessed and used the knowledge, skill and care which attorneys have a duty to provide "based on the testimony and evidence given by members of the legal profession who testified as expert witnesses."

[¶ 59.] Although the trial court's instructions did not specifically mention a duty to refer, they did allow the jury to decide this issue because they instructed that: (1) Wedmore had the duty to disclose a proposed course of action, including the material benefits and risks, and the likelihood those risks would occur and the consequences; (2) if *alternatives* were rea-

---

21. Behrens' expert testified that an attorney cannot "talk about risks at all in any meaningful way without talking about bankruptcy, particularly in the times that we're in." Their expert also testified that it is standard practice in South Dakota to advise clients of the risks of nonpayment in an installment transaction.

sonably appropriate, Wedmore also had the duty to disclose the material benefits and risks associated with alternatives; (3) Wedmore had the duty to disclose *all material information necessary for the client to make an informed decision,* which information the attorney *should know* that *a reasonable client would attach significance to, when deciding the proposed course of action;* and (4) the standard of skill and care should be determined by Behrens' experts who testified at trial. We believe that these instructions were adequate to allow the jury to decide this issue because, as Behrens concede, the duty to refer to a specialist arises "if under the particular circumstances a reasonable and prudent attorney would do so." *See Horne v. Peckham,* 97 Cal.App.3d 404, 158 Cal.Rptr. 714 (1979), *disapproved on other grounds by ITT Small Business Finance Corp. v. Niles,* 9 Cal.4th 245, 36 Cal. Rptr.2d 552, 885 P.2d 965 (1994).

[¶ 60.] Under the trial court's instructions, Behrens were permitted to argue, and the jury was permitted to find, that Wedmore should have known that if the Initial Agreement was not binding, a reasonable client in Behrens position would attach significance to the consequences of a bankruptcy. If the jury so found, it was further permitted to find for Behrens if Wedmore failed to advise of those consequences and appropriate alternatives in the event of a bankruptcy. Therefore, although not specifically referring to a specialist, the trial court's instructions permitted the jury to find for Behrens if this transaction reasonably required service of a specialist but that that level of skill and care was not provided. Because the instructions as a whole adequately explained the law to the jury, there was no prejudicial error. *Parker,* 2002 SD 29, ¶ 18, 641 N.W.2d at 120, *declined to follow on other grounds by Martin,* 2004 SD 82, 683 N.W.2d at 399.

5. Whether admission of a business appraisal was prejudicial error.

[¶ 61.] Before selling their business, Behrens asked Ketel, Thorstenson & Co., an accounting firm, to perform an appraisal. In performing the appraisal, Ketel Thorstenson sent a letter to Loewen asking for Loewen's estimate of the value of Behrens Mortuary. Ketel Thorstenson used this and other information to determine the fair market value of Behrens Mortuary. Ketel Thorstenson ultimately provided Behrens with an "Informal Business Valuation Report."

[¶ 62.] Wedmore offered the appraisal during his cross-examination of Don Behrens to prove his opinion of the value of the business. Although Behrens objected, the trial court admitted the appraisal because Behrens had previously produced it as his sworn response to an interrogatory asking his opinion of the value of the business.

[¶ 63.] We review a trial court's evidentiary rulings under an abuse of discretion standard. *Novak v. McEldowney,* 2002 SD 162, ¶ 7, 655 N.W.2d 909, 912 (citations omitted). "An evidentiary ruling will not be overturned unless error is 'demonstrated ... [and] shown to be prejudicial error.' Error is prejudicial when, 'in all probability ... [it] produced some effect upon the final result and affected rights of the party assigning it.'" *Id.* (internal citations omitted). Thus, in order to prevail on appeal, Behrens must show both that the trial court abused its discretion and that the error was prejudicial.

[¶ 64.] Behrens argue that the trial court abused its discretion by concluding that through the mere production of the appraisal in discovery, Behrens waived their right to an evidentiary objec-

tion. Behrens contend that "[a] document does not become admissible simply by being produced in response to a discovery request." We generally agree. However, this evidence was not admitted solely because it was produced in discovery. It was introduced because it was Don Behrens' sworn opinion of value. Therefore, it was admissible for reasons other than the fact that it was simply produced in discovery.

[¶ 65.] We also reject Behrens' broad argument that "conclusions contained in an appraisal cannot generally be sought from a party other than the person who prepared it." Although we acknowledge the potential foundational problems in admitting Ketel Thorstenson's work product as Behrens' opinion, Don Behrens adopted this valuation opinion in his answers to interrogatories. Moreover, a business or property owner is clearly qualified to testify to the value of his business or property. *See Geo. A. Clark & Son, Inc. v. Nold,* 85 S.D. 468, 474, 185 N.W.2d 677, 680 (1971). Therefore, because Don Behrens had previously adopted the appraisal as his sworn opinion of the business's market value, it was admissible as Behrens' opinion.[22]

6. Whether Behrens were entitled to a mistrial based upon Wedmore's method of presenting exhibits.

[¶ 66.] As part of his defense, Wedmore presented binders of exhibits he intended to introduce during his direct examination. Wedmore gave the binders to the trial court and Behrens and requested permission to distribute them to the jury. Behrens objected because they had not had the opportunity to review the documents. The trial court recessed and gave Behrens time to review the documents. After the recess, the trial court permitted Wedmore to distribute the binders to the jury, and Behrens did not renew their objection. However, after Wedmore began his defense, it became apparent that exhibits in the jurors' binders were misnumbered, and because of the resulting confusion, the trial court removed the binders from the jury. Behrens subsequently moved for a mistrial, claiming that jurors had paged through the binders and, as a result, had looked at at least one exhibit that was not admitted into evidence.

[¶ 67.] "The trial court's denial of a motion for mistrial is reviewed under the abuse of discretion standard." *State v. Owens,* 2002 SD 42, ¶ 101, 643 N.W.2d 735, 758 (citing *State v. Winckler,* 260 N.W.2d 356, 368 (S.D.1977)). A denial of a mistrial will be affirmed "absent an 'abuse of discretion resulting in clear prejudice.'" *United States v. Gutierrez,* 351 F.3d 897, 902 (8thCir.2003) (citation omitted).

[¶ 68.] Although we do not condone a jury's receipt of documents before their admission, Behrens have failed to establish an abuse of discretion or prejudice. Initially, it must be noted that Behrens have not pointed to any particular information in the binder that could have affected the jury's decision. Behrens only point to one non-admitted exhibit that jurors "may" have seen. This is significant because the trial court invited counsel to voir dire the jury on this issue, but Behrens declined.

---

22. Behrens also point out that technically, the document that was actually admitted was not the same document referred to in Behrens' sworn answers to interrogatories. Behrens indicate that the admitted document came from Ketel Thorstenson's files. Behrens have not, however, argued that the exhibit actually admitted differed in any respect from the document attached to the answers to the interrogatories. Therefore, even assuming error, this discrepancy was harmless.

Having failed to establish a record on this issue, we cannot say whether the jury actually reviewed any improper exhibit or if the binders caused prejudice. Moreover, the trial court specifically noted that it did not observe jurors looking at exhibits that were not in evidence. Therefore, no error or prejudice has been shown.

7. Whether Wedmore was entitled to certain disbursements as a prevailing party.

[¶ 69.] Pursuant to SDCL 15–17–37,[23] the trial court awarded Wedmore $12,416.62 in disbursements. This amount was $248.34 less than Wedmore requested.[24] "We review an award of disbursements under an abuse of discretion standard." *Michlitsch v. Meyer*, 1999 SD 69, ¶ 10, 594 N.W.2d 731, 733 (citations omitted). "Only those expenses specifically authorized by statute may be taxed as disbursements, and although the trial court has some discretion, it must use cautious restraint within the statutory specifications." *Lewis v. Aslesen*, 2001 SD 131, ¶ 10, 635 N.W.2d 744, 747 (citation omitted).

[¶ 70.] Behrens first argue that this Court should "cut Wedmore's photocopy expenses to bring them in line with the photocopy expenses incurred by Plaintiffs." Behrens point out that Wedmore made ten times as many photocopies as they did. However, the statute does not require expenditures to be comparable, and Behrens have cited no authority requiring a rule of strict comparison. Rather, the statutory test is simply whether the expenditures were "necessarily incurred in gathering and procuring evidence or bringing the matter to trial." SDCL 15–17–37.

[¶ 71.] In this case, Wedmore's file alone was approximately five thousand pages in length. In preparing for trial, Wedmore was required to duplicate portions of his file for his own use as well as for a number of experts involved in the litigation. "The trial court was [obviously] satisfied that the photocopy expenses were 'necessarily incurred in gathering and procuring evidence or bringing the matter to trial,'" *Zahn v. Musick*, 2000 SD 26, ¶ 51, 605 N.W.2d 823, 833, and we see no abuse of discretion in this award.

[¶ 72.] The second disputed disbursement is a $356 bill paid to the law firm of Behrens' local bankruptcy counsel. These costs were incurred by Wedmore to obtain bankruptcy documents he needed for his defense. The bill was for attorney David Nadolski's time spent "responding" to Wedmore's request for access to the bankruptcy file. Wedmore had to pay this bill to receive the bankruptcy documents from Nadolski.

[¶ 73.] Behrens assert that reimbursing Wedmore for those costs is the same as reimbursing Wedmore for "expert witness fees incurred in preparing for a deposition." Behrens point out that such expert witness fees are not generally recoverable

---

23. SDCL 15–17–37 provides:

The prevailing party in a civil action or special proceeding may recover expenditures *necessarily incurred in gathering and procuring evidence or bringing the matter to trial.* Such expenditures include costs of telephonic hearings, costs of telephoto or fax charges, fees of witnesses, interpreters, translators, officers, printers, service of process, filing, expenses from telephone calls, copying, costs of original and copies of transcripts and reporter's attendance fees, court appointed experts and other similar expenses and charges. These expenditures are termed "disbursements" and are taxed pursuant to § 15–6–54(d).
(Emphasis added.)

24. The trial court found that $248.34 in unitemized copies were not expenditures "necessarily incurred in gathering and procuring evidence or bringing the matter to trial."

under SDCL 15–17–37. While this Court has stated that expert witness fees are generally not recoverable, Nadolski's time retrieving the bankruptcy documents was not an expert witness fee. Rather, it was an expense required to procure documents for the defense of the action. Ultimately, "[t]he trial court was in the best position to determine the reasonableness of these disbursements and no abuse of discretion is shown." *Zahn*, 2000 SD 26, ¶ 51, 605 N.W.2d at 833.

[¶ 74.] Considering our disposition of these issues, we need not reach the issue raised by the notice of review.

[¶ 75.] Affirmed.

[¶ 76.] GILBERTSON, Chief Justice, and SABERS, and MEIERHENRY, Justices, and MILLER, Retired Justice, concur.

[¶ 77.] MILLER, Retired Justice, sitting for KONENKAMP, Justice, disqualified.